**UNITED STATES of America, Plaintiff,**

v.

**John GOTTI, Defendant.**

**UNITED STATES of America, Plaintiff,**

v.

**Frank LOCASCIO, Defendant.**

**No. CR–90–1051.**

United States District Court,
E.D. New York.

April 3, 1997.

Laura A. Ward, James Orenstein, Assistant U.S. Attorneys, Brooklyn, for U.S.

Margaret E. Alverson, New York City, Charles J. Ogletree, Jr., Cambridge, MA, Kimberly Homan, Sheketoff & Homan, Boston, MA, for John Gotti.

Jay Goldberg, New York City, for Frank Locascio.

*MEMORANDUM AND ORDER*

GLASSER, United States District Judge:

This is the fourth motion filed on behalf of John Gotti pursuant to Rule 33, Fed.R.Crim. P., in which he seeks a new trial, asserting his entitlement to it in the interest of justice.

It is also the fourth motion filed on behalf of Frank Locascio seeking the same relief Because the bases upon which the motions are brought overlap and, in the final analysis, rest upon the same claims, i.e., that Salvatore Gravano's testimony at their trial was perjurious and that the government knowingly permitted it to be given, the motions have been consolidated.

The primary basis for these motions is the new evidence which allegedly establishes that Salvatore Gravano, a witness on behalf of the government, committed perjury when he testified at their trial. The "new evidence" is the claimed discovery that Gravano committed crimes in addition to those he admitted during the course of his testimony and was therefore not cross-examined with respect to them. Those crimes allegedly are: (1) Gravano's involvement in a conspiracy to import cocaine into the United States, the successful completion of which was frustrated by the seizure of a large quantity of cocaine in July, 1991 from a fishing vessel named "Hunter"; (2) Gravano's murder of a person named Jules Cass in the course of an armed robbery in 1972; and (3) Gravano's enlistment of a person named Steve Goodman to extort Donald Malley, whose death was caused by a beating administered by Goodman. Gotti further claims, as does Locascio, that the government had knowledge of Gravano's alleged perjury in denying his involvement with drugs, failed to disclose that alleged perjury and thus intentionally misled the jury in obtaining their convictions.

The alleged concealment of Gravano's participation in the narcotics conspiracy was especially egregious, the defendants claim, because of Gravano's stand against drugs to which he testified at trial. Moreover, the alleged perjury which the government is charged with deliberately failing to disclose is also especially egregious, defendants claim, given the prosecutors' repeated references to Gravano's incentive to tell the truth afforded by his cooperation agreement with the government. The sum of those claimed new discoveries, the defendants assert, entitles them to a new trial upon the authority of cases exemplified by *United States v. Wallach,* 935 F.2d 445 (2d Cir.1991), *on remand,* 788 F.Supp. 739 (S.D.N.Y.1992), *aff'd,* 979 F.2d 912 (2d Cir.1992), *cert. denied,* 508 U.S. 939, 113 S.Ct. 2414, 124 L.Ed.2d 637 (1993).

Notwithstanding my belief that the events leading up to the trial and conviction of the defendants and the post-trial proceedings that followed in its wake are probably well-known, a re-telling, it is believed, will be useful insofar as it will place these motions in context.

## I. *Background*

In December 1990, John Gotti, Salvatore Gravano, Frank Locascio and Thomas Gambino were arrested and then arraigned upon an indictment which variously charged some *or* all of them with racketeering, murder, obstruction of justice, racketeering conspiracy, conspiracy to murder, illegal gambling, obstruction of justice, conspiracy to obstruct justice and conspiracy to defraud the United States by obstructing its collection of income taxes from John Gotti. The predicate acts of racketeering also included loansharking conspiracy (extortionate extensions and collections of credit). Thomas Gambino was severed from this indictment and was later tried and convicted of racketeering which did not include predicate racketeering acts of murder. See *United States v. Gambino,* 59 F.3d 353 (2d Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 1671, 134 L.Ed.2d 776 (1996).

Following a hearing on the issue of bail, the three remaining defendants, Gotti, Gravano and Locascio, were detained pending trial.

Approximately ten weeks prior to the commencement of the selection of a jury, Salvatore Gravano entered into a cooperation agreement with the government pursuant to which he pleaded guilty to a superseding information in which he was charged with violating the racketeering statute, the predicate acts for which were nineteen murders, illegal gambling businesses, the extortionate

extensions and collections of credit, obstruction of justice and bribery of a public servant.

After extensive and complex pretrial motions which were filed and decided [1] and the selection of an anonymous and sequestered jury, the trial of the remaining two defendants, John Gotti and Frank Locascio, commenced on January 29, 1992. The testimony of upwards of thirty witnesses was presented, audio cassettes of electronically intercepted conversations were received in evidence and transcripts of those conversations which filled seven loose-leaf binders were received as aids for the jury while listening to those audio cassettes. Also received in evidence were extensive video recordings, photographs and documents. The transcript of the trial exceeds 8,000 pages, a significant portion of which reflects the vigorous and extensive cross examination of Salvatore Gravano over a period of six days by counsel for the defendants. On April 2, 1992, the jury returned a verdict. John Gotti was found guilty on all counts and Frank Locascio was found guilty on all counts save one which charged him with conducting an illegal gambling business.

The first motion for a new trial was brought prior to the sentencing of the defendants. It was bottomed upon the affirmation of William M. Kunstler as one of their "motion attorneys" and alleged prosecutorial misconduct and a conspiracy by the government to disqualify a juror they claimed the government suspected of being inclined towards the defendants. In a Memorandum and Order dated June 23, 1992, familiarity with which is assumed, that motion was denied. The defendants then sought relief from their convictions from the United States Court of Appeals for the Second Circuit.

Pending that appeal, the defendants filed a second motion for a new trial pursuant to Rule 33, Fed.R.Crim.P. That motion was prompted by the discovery of then Assistant United States Attorney, and now judge, John Gleeson, ("Gleeson") who was the lead prosecutor at their trial, that in the course of preparing for the trial of *United States v. Orena* he received information obtained from Alphonse D'Arco, ("D'Arco") a government witness who had been a major organized crime figure, that D'Arco reported that he had heard that Gravano was involved in other murders which he did not acknowledge at the defendants' trial. After speedily confirming that the trial team had never previously heard that allegation, Gleeson disclosed that information to the attorneys for Gotti and Locascio. The motion that followed advanced the contention that the newly discovered evidence established that Gravano lied at trial and that what would have been impeachment material was knowingly suppressed by the government. In a Memorandum and Order dated October 29, 1992, familiarity with which is assumed, that motion was denied and the denial was affirmed *in United States v. Locascio,* 6 F.3d 924, 949–50 (2d Cir.1993), *cert. denied,* 511 U.S. 1070, 114 S.Ct. 1645, 1646, 128 L.Ed.2d 365 (1994).

Some time thereafter Gotti and Locascio brought a third motion pursuant to Rule 33, Fed.R.Crim.P., seeking a new trial in the interests of justice, relying upon reports obtained by defense counsel in an unrelated case that Special Agents of the FBI had interviewed D'Arco prior to their trial. They claimed that the knowledge of D'Arco's hearsay information must thus have been known to the government trial team. This third

1. *In re Heimerle,* 788 F.Supp. 700 (E.D.N.Y.1992) (motion to quash subpoena); *United States v. Gotti,* 787 F.Supp. 319 (E.D.N.Y.1992) (motion by media for transcripts of jury voir dire during trial and of side bar conferences); *United States v. Gotti,* 784 F.Supp. 1017 (E.D.N.Y.1992) (motion for bill of particulars); *United States v. Gotti,* 784 F.Supp. 1013 (E.D.N.Y.1992) (motion to disclose names of jurors in two prior trials); *United States v. Gotti,* 784 F.Supp. 1011 (E.D.N.Y.1992) (defendants' motion for writ of habeas corpus ad testificandum to compel production of prison inmate and participant in witness protection program to testify); *United States v. Gotti,* 782

F.Supp. 737 (E.D.N.Y.1992) (motion to disqualify attorneys); *United States v. Gotti,* 777 F.Supp. 224 (E.D.N.Y.1991) (motion to empanel an anonymous and sequestered jury); *United States v. Gotti,* 776 F.Supp. 666 (E.D.N.Y.1991) (motion to reconsider order of detention); *United States v. Gotti,* 771 F.Supp. 535 (E.D.N.Y.1991) (motion to suppress electronic surveillance; for *Franks v. Delaware* hearing; for audibility hearing); *United States v. Gotti,* 755 F.Supp. 1159 (E.D.N.Y.1991) (motion to modify conditions of detention); *United States v. Gotti,* 753 F.Supp. 443 (E.D.N.Y. 1990) (motion to close bail hearing to public).

motion for a new trial was denied in a Memorandum and Order dated March 2, 1993, familiarity with which is also assumed. The denial was based upon affidavits from the government which confuted the defendants' assertions and which was similarly affirmed on appeal. *See Locascio, supra.*

While the appeal of their conviction was still pending, the case of *United States v. Pasquale Conte. et al,* CR–93–0085(ILG) was assigned to this court. Conte, a capo in the Gambino Organized Crime Family, was indicted for murder. That indictment was superseded and he was charged with murder, conspiracy to murder and heroin trafficking. In support of an application to detain Conte pending trial, the government submitted a letter to the court (the "Conte letter") which stated that Gravano, acting upon Gotti's instruction, told Conte that he could resume his heroin importation activity. Upon learning of that letter, the defendants filed a supplemental brief in their then pending appeal, urging the government's knowing reliance upon Gravano's perjury when he testified that he was against drugs in obtaining their convictions. The Court of Appeals, affirming their convictions, did not address their claim for the reason that the issue had not been presented to this court.

## II. *The Bases for These Fourth Motions*

### A. *The "Hunter" Conspiracy*

On July 30, 1991, seven months after Gravano was arrested in December, 1990 and ordered detained pending trial, an indictment was filed charging Peter Califano and ten others with conspiracy to import cocaine into the United States and conspiracy to distribute and possess with intent to distribute cocaine. The events upon which the indictment was based and its aftermath are described on pages 10–19 of the government's memorandum in opposition to this motion ("Gov't Mem.") and are here summarized.

On July 21, 1991, the government seized the fishing vessel "Hunter" several miles off the shore of the Fire Island National Park. A search of the vessel revealed more than 4,000 kilograms of cocaine secreted in cargo bins below deck. The cocaine had been transferred to the Hunter earlier in the day from the "Blue Crown I", a Panamanian cargo vessel. Peter Califano, Hunter's captain, John Saracco, a member of his crew, and the captain and crew of the Panamanian vessel were all arrested and indicted. *United States v. Peter Califano, et al.,* CR–917–92 (EHN). Califano pleaded guilty on October 17, 1991 before Gravano had first indicated to the government his interest in cooperation. Califano's plea, pursuant to an agreement with the government (Gov't Mem. Ex. C), was to a one-count superseding information charging him with conspiring to possess with intent to distribute more than 500 grams of cocaine which carried a mandatory prison sentence of 5–40 years. The various proceedings concerning Califano's sentence are described in detail in the Gov't Mem. at pages 11–13 and will not be further restated here beyond noting that he was ultimately sentenced on March 12, 1993 to a term of 188 months over the government's opposition to its leniency. Saracco was permitted to plead to a much lesser offense because of his mental disorder and retardation. He was sentenced to a term of probation which required him to continue with psychiatric care. The third member of Califano's crew was a DEA informant who never implicated Gravano in that conspiracy. Gov't Mem. p. 13, fn.11.

In an affidavit by Gleeson ("Gleeson Aff."), he swears that at the time the Hunter was seized he and other members of the Gotti prosecution team were continuing with the grand jury investigation of the Gambino Family and also preparing this case for trial; that he learned of the seizure from news reports which related that among those arrested was an associate of the Gambino Family and that Gotti's son was believed to be involved in the event; that he debriefed Gravano extensively between the time he began cooperating with the government and March 1992 when he testified at the Gotti trial, a period of approximately four months; that during that period he questioned Gravano about a wide variety of crimes, including the cocaine seizure from the Hunter; that Gravano denied knowledge of or involvement in that event and did not know who was involved in it; that "I believed then, and believe now, that Gravano's statements on this subject were truthful" and he respectfully

submits "that we did not elicit perjurious testimony at all; and we certainly never elicited such testimony knowingly."

Gleeson's affidavit goes on to declare that he recently learned that late in September 1991 an informant told DEA agents that he heard a rumor from a third person he refused to identify, that Gravano was primarily responsible for arranging the Hunter cocaine shipment. "I had not previously been aware of this information," declares Gleeson and "Even if I had, I would not have questioned Gravano differently either in preparing his direct examination or at trial."

Significant in this regard is the affidavit of Assistant U.S. Attorney James Orenstein ("Orenstein Aff."), a member of the Gotti trial team, which is annexed as Exhibit G to the Gov't Mem., which sheds light on how Gleeson recently became informed of the compounded hearsay information imparted to the DEA agents by an informant.

In his affidavit, dated January 29, 1996, Assistant U.S. Attorney Orenstein declares, after this motion for a new trial was filed, he reviewed the "closed files" of the Hunter case which consisted of several large boxes containing thousands of pages of documents. That review yielded merely two documents which "even suggest that Gravano may have had a role in the importation conspiracy. Of these two documents, ... only one was in existence at the time of Gotti's conviction, and neither was known to any member of the prosecution team in this case until last week." Orenstein Aff. at 3. The first and only document in existence prior to the Gotti trial was a DEA report dated December 10, 1991 in which a DEA agent records an interview with an informant on September 25, 1991. The informant is stated to have told the agent that he heard a rumor from a source he would not identify that Gravano was "the primary person" who arranged for the Hunter to pick up the cocaine. The informant was not a party to the Hunter conspiracy. He was merely reporting a rumor he heard. The informant also said that he did not know who Gravano was. Orenstein Aff. at 4.

The second document dated September 23, 1992 (more than five months after the jury verdict in the Gotti case) was a DEA report describing a statement by a different informant who was a participant in the Hunter conspiracy. This informant recounted that yet another participant told him that he arranged for the cocaine importation and that "big people" were involved. Gravano was neither named nor identified as one of the "big people." Investigative reports showed highly placed members of the Gambino Family were indeed observed meeting with participants in the Hunter conspiracy, but Gravano was not among them. Orenstein Aff. at 5. Assistant U.S. Attorney Orenstein's affidavit then describes the basis for his declaration that no member of the Gotti trial team had knowledge of those reports prior to the return of the jury's verdict and that no other Eastern District prosecutor had reviewed the reports until months after Gotti's conviction.

The affidavits submitted on behalf of Gotti pertaining to this aspect of his motion are one by Michael DeSantis dated December 14, 1995, one day prior to the time to file this motion would expire. Although neither witnessed nor notarized it will be regarded as the equivalent of an affidavit pursuant to 28 U.S.C. § 1746. Who is Michael DeSantis? He was a named defendant in three indictments in this court, CR–90–446(S–4)(EHN); CR–92–415(ILG); CR–92–1112(JBW). He pleaded guilty on May 3, 1994 to Counts One and Two of CR–90–446(S–4)(EHN) charging him with racketeering and racketeering conspiracy in violation of 18 U.S.C. §§ 1962(c) and (d) (racketeering acts two, four, six, seven, eight, fifty and fifty-one); Counts Five, Six, Nine, Twelve, Thirteen, Fourteen, Fifteen and Sixteen, charging him with murder, attempted murder and conspiracy to murder in aid of racketeering in violation of 18 U.S.C. §§ 1959(a)(1) and (a)(5); Counts Sixty–Seven and Sixty–Eight charging him with extortion in violation of 18 U.S.C. § 1951; Counts Sixty–Nine charging him with conspiracy to receive labor payoffs in violation of 18 U.S.C. § 371 and Count Seventy–Two charging him with conspiracy to defraud the Internal Revenue Service in violation of 18 U.S.C. § 371. (Def's Reply Mem. Ex. B). The charges to which he pleaded guilty allege that those crimes were committed by

him in connection with his membership in the Lucchese Organized Crime Family and his guilty plea is an acknowledgment of that membership. Pursuant to his plea agreement with the government entered into in accordance with Rule 11(e)(1)(C), Fed. R.Crim.P., DeSantis was sentenced to a term of imprisonment for twenty-one years. As part of that agreement, the other two indictments against him were dismissed upon the government's motion.

It was interesting to note that as part of that agreement, the government agreed not to prosecute DeSantis for his participation with Anthony Casso and others in a 1989–1991 shipment of cocaine. Given the close relationship that existed between the Gambino and the Lucchese Organized Crime Families during that period, it defies credulity to believe that were there information linking Gravano to the Hunter conspiracy it would not have been made known to the defendants sooner than on the day preceding the expiration of the time within which to file this motion.

That Gotti was aware of Casso's (also known as "Gaspipe") involvement in the importation of narcotics as far back as November 30, 1989 is clearly revealed in Gx 303.1A, Gx 303.1A(T) 114,[2] an audio cassette on which the following conversation was intercepted in the apartment above the Ravenite Club to which Gotti, Gravano and Locascio retreated in the belief that they could talk freely there without fear of being overheard:

GOTTI: Ah ... they can pick out one with, ah, "Gaspipe's" boat got caught in Howard Beach, on Freeport. Ah, fifty thousand (50,000) bales, or fifty thousand (50,000) pounds, fifty thousand (50,000) tons. Did that happen one time?

GRAVANO: I really don't know. Ahh ...

GOTTI: I mean, I'm not aware.

GRAVANO: (IA) probably.

GOTTI: Ah, this is what I, I understand. They got one, a tape with that. Ahh ... "see them fuckin' guys. That was half a ours...." Ah, "What do you man half

ours?" "Well, 'Gaspipe' called me up this morning; 'Gas' called me up this morning. It's half ours; half theirs; it's half the guy up the fuckin' block. Fifty thousand (50,000) pounds, he partners this."

The extensive litany of violent crimes that could be recited to describe the life of DeSantis and which eloquently bespeak his contempt for the law would also eloquently bespeak his contempt for an oath and counsel discrediting his affidavit.

The second affidavit submitted on behalf of this motion is by Richard A. Rehbock. Judicial notice is taken of the fact that he is the lawyer who represents John Gotti, Jr. His affidavit recounts a meeting he and a private investigator had with Peter Califano, the Hunter captain, in the federal prison in which Califano is currently incarcerated. Rehbock relates that Califano told him that his direct liaison to the cocaine conspiracy was a person named Tommy Carew, a/k/a Tommy Irish and that Carew informed him (Califano) that the cocaine was for Anthony Casso and Salvatore Gravano. Rehbock's affidavit goes on to state that while his case was pending, Califano learned of Gravano's cooperation with the government and that the government never sought to learn from him to whom he was to deliver the drugs. It should be added that he never volunteered to relate this information to anyone else until now. Significantly, Califano testified pursuant to subpoena before a grand jury in this district in the summer of 1992 after this trial had ended. He was asked to identify all the participants in the Hunter affair and his response mentioned neither Gravano nor Carew. Gov't Mem. p. 15. He was sentenced pursuant to a plea agreement to a term of imprisonment more lenient than the sentencing guidelines would otherwise have required. Rehbock concludes by stating that Califano informed him that Tommy Irish is fully familiar with the participation of Casso and Gravano in the Hunter affair and that he, Califano, is available for further discussion of the matter. Given this last report of

---

2. Citations to "Gx _____" are to the cassettes played at the defendants' trial; citations to "Gx _____(T)" are to the transcripts of those tapes used by the jury as aids, but not received in

his offer of availability, the absence of a sworn affidavit by Califano himself rather than the hearsay affidavit by Rehbock, is curious.

The government's memorandum at 18–19 notes that Rehbock's affidavit recounting Califano's statement that he was arrested on July 23, 1991 is wrong. He was arrested, in fact, on July 21, 1991. The government advises that Tommy Carew is also cooperating with the government. A critical reading of the Rehbock submission and the DeSantis submission and of every other submission in support of this motion reveals what can at best be described as only a veiled and muted inference that the government was aware of Gravano's alleged involvement in the Hunter affair. That inference is sought to be implanted from the fact that Gravano, having been debriefed about all of his criminal activity, certainly must have been debriefed about the Hunter affair and therefore the government had knowledge of it. The affidavits of Gleeson and Orenstein, however, stand unrefuted. The government had no information when Gotti was tried that Gravano had any involvement in the Hunter affair and any information that he did, submitted in support of this motion, is hearsay from sources of questionable credibility.[3]

Annexed as Exhibit H to Materials in Support of John Gotti's Motion for a New Trial is the sworn testimony of Salvatore Gravano elicited from him by counsel for Vincent Gigante at a hearing before Judge Nickerson on March 5, 1996 in which he denied any involvement in the Hunter affair. That denial would have foreclosed any attempt to prove his involvement by extrinsic evidence. Fed.R.Evid. 608(b).

### B. *The Cass Murder*

A further claim in support of Gotti's motion, is his assertion that Gravano murdered Jules Cass on September 22, 1972 when Cass resisted Gravano's attempt to rob him. There isn't any suggestion in the submissions on behalf of Gotti that the government was aware of or had any knowledge of this mur-

der during the Gotti trial. In his affidavit of January 29, 1996, Gleeson states that "until recently, I was unaware of that murder myself." Gleeson Aff. at 8. The government reports that it had interviewed Gravano concerning this allegation and he had denied any involvement in or knowledge of the event. Gov't Mem. at 20. In his reply memorandum at page 22, Gotti regards it as hardly surprising that Gravano denied knowledge of the murder because admitting it could subject him to a state prosecution for murder. The question that inevitably arises is why Gravano would have omitted to inform the government of this murder and informed them of sixteen others of which they had no knowledge and for any or all of which he could be prosecuted by the state. The court has also been unable to find any declaration by the defendant as to when this "evidence" was discovered or why its discovery in the past was precluded.

### C. *The Malley Murder*

The affidavit of counsel in support of this motion by Gotti, asserts, upon information and belief, that Gotti has discovered another murder in which Gravano was involved but did not reveal. The defendant claims that in 1975–1976 Gravano hired Steve Goodman to force Donald Malley to sign a document relinquishing half of his legitimate business to confederates of Gravano; that Malley died as a result of a beating administered by Goodman who then delivered a signed document stained with Malley's blood to Gravano. The nature of the document is not revealed. The defendant does not explain when he discovered this evidence of a murder allegedly committed twenty years ago or why the evidence could not have been discovered earlier.

At the outset, it must be noted that the allegation regarding this event is not supported by anything more than counsel's affidavit based upon information and belief and a narrative of events of undisclosed origin set out in Exhibit D to Materials in Support of John Gotti's Motion for a New Trial.

---

evidence. Citations to "Tr." are to the trial transcript.

**3.** *See* discussion below exonerating the government from any obligation in this regard, relying

upon *United States v. Agurs,* 427 U.S. 97, 109, n. 16, 96 S.Ct. 2392, 2400, n. 16, 49 L.Ed.2d 342 (1976) among others.

The government's response is found in the affidavits of Gleeson and Orenstein. The Gleeson affidavit relates that early on in the debriefing of Gravano he informed the government of a murder about which he expected to be cross examined,[4] and the circumstances surrounding that murder which were as follows: In the 1970s, an associate of another crime family who was a friend of Gravano, wanted to keep a greater portion of the proceeds of an extortion than his bosses would allow. He requested and received Gravano's permission to say that Gravano was sharing the extortion proceeds in the belief that he would thus be permitted to keep a larger portion. That representation was false. Gravano later learned that the victim died from a beating he received incident to the extortion. To "protect the associate from the consequences of the murder within organized crime circles (the victim was himself involved in organized crime), Gravano gave him permission to falsely tell others that the extortion of the victim (and the beating from which he died) had the imprimatur of Gravano. Although I did not know the name Donald Malley at the time, I have since learned that to be the victim's name."

"In short, Gravano told me during our initial debriefings before the trial of this case, that he believed he might eventually be accused of this murder in cross-examination because some people may have believed that he had authorized it. However, he had not authorized it, and he had no criminal responsibility for it. Therefore, I concluded there was no obligation to disclose these facts to the defendants." Gleeson Aff. at 9 and 10; Orenstein Aff. at 12.

In Exhibit H, referred to above, Gravano's sworn testimony is consistent with the Gleeson affidavit.

D. *Perjured Testimony as to Narcotics, etc.*

The additional bases upon which Gotti's motion is built are simply summarized without elaboration and are listed in the affidavit of Margaret E. Alverson, Esq. in support of the motion and elaborated upon to some extent in Materials in Support of John Gotti's Motion for New Trial. They are:

(1) Gravano's false trial testimony

   (a) that he had a principled opposition to drugs and drug dealing;

   (b) that he had not been personally involved in drug dealing;

   (c) that he had told the government during his numerous debriefings, of all the crimes he had committed during his life;

   (d) that his plea agreement encompassed all of the crimes which he had ever committed and that all such crimes were carried out in furtherance of the enterprise alleged in the indictment;

   (e) that he had only personally committed one murder;

   (f) that no one had ever been injured in the course of any armed robbery in which he was a participant.

Locascio's motion is bottomed primarily on Gravano's allegedly false trial testimony that he had a stand against drugs and the claim that the government impermissibly vouched for Gravano's credibility in summation.

A conscientious disposition of these motions has entailed this court's diligent review of the bulk of the more than 8,000 pages of the record of this trial; seven loose-leaf binders of transcripts of electronically intercepted conversations; the relevant portions of transcripts of the trial of *United States v. Pape; United States v. Victor Orena; United States v. Conte; United States v. John Gambino; United States v. Thomas Gambino; United States v. Bisaccia;* and a variety of affidavits, plea agreements and other documents. Toward that end I have read the most recent decisions of the United States Supreme Court and every case decided by the Court of Appeals for this circuit subsequent to those decisions and most, if not all, decided prior thereto addressing Rule 33 motions.

### III. *The Record*

These motions are yet others in an unrelenting effort on the part of these defendants

---

**4.** His expectation would suggest that the defendant was aware of this event at the time of trial.

to set aside verdicts of "guilty" pronounced by a jury selected with great care over a period of approximately eight days, accepted by them as being satisfactory representatives of the community (Tr. 1497), and who solemnly swore that they would well and truly try this case and render a true verdict according to the law. The attacks upon that verdict have the same targets, Salvatore Gravano and the United States government. As to Gravano, the attack is aimed at establishing that he perjured himself at their trial. As to the government, the attack is aimed at establishing that the government knew he was perjuring himself and not only countenanced it, but reinforced it in its summation and, in addition, withheld material it was obligated by *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) to deliver.

In one such motion, the defendants claimed newly discovered evidence that Gravano committed perjury when he testified that he admitted to the prosecution all the murders he committed, having concealed that he murdered Pietro Inzerillo, Eddie Lino, a person named Harold whose last name was unknown and Nicky Corazzo's son-in-law. That newly discovered evidence was bottomed upon information that an unnamed inmate of a federal prison told a New Jersey State policeman what he had been told by someone else. That motion was denied in a Memorandum and Order dated October 29, 1992, familiarity with which is assumed.

In another such motion, the defendants sought a new trial claiming newly discovered evidence that *Brady* material had been withheld from them and their repeated assertions that Gravano committed perjury while testifying at their trial. This motion was denied in a Memorandum and Order dated March 2, 1993, familiarity with which is assumed.[5]

■ The common thread that runs through this and the prior motions and which is hopelessly misplaced in the overall fabric of this case is that Gravano was the government's key and indispensable witness without whom these defendants could not have been convicted. Conveniently avoided is the fact that prior to and after the severance of Thomas Gambino, Salvatore Gravano was a named defendant in the indictment of this case together with John Gotti and Frank Locascio and a mere ten weeks or so prior to Gravano's election to cooperate, the government was fully prepared to proceed to trial against all three. Conveniently, and surely deliberately avoided is any reference to the words from their own mouths which convicted them and which Gravano's testimony essentially echoed. The recognition of that unassailable fact was acknowledged with exquisite simplicity by counsel for Locascio in his opening statement to the jury: "This is a tape case,...." Tr. at 1599.

The validity of that acknowledgment and the inevitability of their conviction based upon those tapes alone will be made plain by a reading of the words which fell from their mouths and which will be here set out as they pertain to the indictment.

## A. The RICO Counts

### I. The Enterprise

The virtually undisputed extensive testimony on the structure, organization and activity of the Gambino Organized Crime Family by Special Agents of the Federal Bureau of Investigation ("FBI") George Gabriel and Lewis Schiliro aside, the words of Gotti and Locascio received in evidence as Gx 300.1A (the audio cassette) of the intercepted conversations on January 4, 1990 in the apartment above the Ravenite Club at which John Gotti, Salvatore Gravano and Frank Locascio were present, were as follows:

GOTTI: Alright, let me tell you what, Sam. I wanna throw a few names out, five or six. I'm not, I'm trying not to

---

5. A motion for a new trial pursuant to Rule 33, Fed.R.Crim.P., was also brought by Thomas Gambino who was originally indicted with these defendants and also convicted after being severed and tried separately. The evidence claimed to be newly discovered there was the government's failure to disclose Gravano's perjury concerning his alleged involvement in narcotics trafficking. *See United States v. Gambino,* 835 F.Supp. 74 (E.D.N.Y.1993), *aff'd,* 59 F.3d 353 (1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 1671, 134 L.Ed.2d 776 (1996), in which that motion was denied.

make people (IA) I want guys that done more than killing.

Gx 300.1A(T) at 2.

That conversation between Gotti and Gravano pertained to a consideration of persons as candidates to be "made" members of the Gambino Family. Tr. at 2027.

GOTTI: Tomorrow I wanna call all our "skippers" in, I'm gonna tell them I'm the "Representante" 'til I say different. Soon as anything happens to me. I'm off the streets, Sammy is the "Acting Boss. He's our 'consigliere.'"

Gx 300.1A(T) at 4.

"Representante" means the boss of the Family and "skippers" refers to capos of the Family. Tr. at 2030.

LOCASCIO: Somebody that's loyal, faithful, and he's there when you need him. That's it. That's it. You don't have no, a guy that makes them the money. You don't want a guy that's a bullshit artist, you don't want that. That's what you need.

GOTTI: So what you could do is, Frankie. Put them five up. We'll put those five guys up....

Gx 300.1A(T) at 20.

LOCASCIO: Alright, then, these are the names: Sam Turone ... Sal ... Sam Turone was with Mario. In case, you know, if there's any discrepancies. Sal D'Aquisto was with Georgie DeCicco; Pietre Angelo ... I guess Tommy Gambino.

Gx 300.1A(T) at 30; *see also* Tr. at 2042–44.

The following is a portion of a conversation intercepted on January 17, 1990 in the apartment above the Ravenite. Present were Gotti, Gravano and Locascio:

GOTTI: It's not a toy. I'm not in the mood for the toys, or games, or kidding, no time. I'm not in the mood for clans. I'm not in the mood for gangs, I'm not in the mood for none a that stuff there. And this is gonna be a "Cosa Nostra" 'til I die. Be it an hour from now, or be it tonight, or a hundred years from now when I'm in jail. It's gonna be a "Cosa Nostra." This ain't gonna be a bunch of

your friends are gonna be "friends of ours," a bunch of Sam's friends are gonna be "friends of ours." It's gonna be the way I say it's gonna be, and a "Cosa Nostra." A "Cosa Nostra!" You might, because a guy's nice to you. And I'm not controlling the way you are. Just saying, you might being a guy brings you a basket, makes him a good guy.... Don't make him a good guy. It makes him a good guy when he's one us and he proves he's right for us. And I'm the best judge a that, I think right now.... I'm not so sure the five guys that I'm putting in, are the first five guys that should be going. But we're doin' it. I'm doing it because I want this thing to be proper.... That's for sure! I wanna see an effort. I gotta see an effort for, starting now, a "Cosa Nostra."...

Gx 301.1A(T) at 93.

Countless other references by them to "Cosa Nostra," "Borgata," "the Family" can be multiplied. The testimony of Salvatore Gravano or any other witness was not necessary to establish the existence of an enterprise.

## 2. *The Murders*

No elaboration is required for the proposition that only two predicate acts of racketeering activity need be proved to support a conviction based upon the RICO statute, 18 U.S.C. § 1962(c). Here, too, the words that fell from their mouths, without more, were damning and just as surely convicted them. As regards the *murder of Robert DiBernardo* (Racketeering Act Three of the indictment), the following conversations between Gotti and Locascio were electronically captured:

GOTTI: When "DiB" got "whacked," they told me a story. I was in jail when I "whacked" him. I knew why it was being done. I done it, anyway. I allowed it to be done, anyway.

Gx 304.1A; 304.1A(T) 2–3; Tr. 2630–31 ("whacked" means to kill or murder).

As regards other murders:

GOTTI: Every fucking time I turn around there's a new company popping up. Re-

bars, Building, Consulting, Concrete. And every time we got a partner that don't agree with us, we kill him. You go to the "Boss," and your "Boss" kills him. He kills 'em. He okays it. Says its alright, good.

Gx 304.1A; 304.1A(T) 4; Tr. 2635–36.

GOTTI: It's a big building. I don't know where. Six, Six million, twenty million, whatever it is? But what, what, where are we going here, Frankie? Frankie, where the hell did all these new companies come from? Where did five new companies come from: Ah, I mean, when, when Nasabeak died, you were nothing. Louie had Gem Steel. You, you told me that the guy talked behind my back. Now you got Gem Steel. The other thing, you told me "Di B" cried behind my back. Now you got all that! And you got, uh, Bobby Sasso....

Gx 304.1A; 304.1A(T) 6–7.

GOTTI: Yeah, but where, er, let me tell you, Frankie, there's creating and there's creating. Now look, Frankie. You wanna put your head with a fuckin' Sammy. You're too bright for that. (Pause) "DiB," did he ever talk subversive to you?

LOCASCIO: Never.

GOTTI: Never talked it to Angelo, and he never talked to "Joe Piney." I took Sammy's word that he talked about me behind my back. Louie, did he ever talk to any of you guys?

LOCASCIO: No.

GOTTI: I took Sammy's word. Louie Di-Bono. And I sat with this guy. I saw the papers and everything. He didn't rob nothin'. You know why he's dying? He's gonna die because he refused to come in when I called. He didn't do nothing else wrong.

Gx 304.1A; 304.1A(T) 31–32. The "Louie" referred to is Louie Milito. See Tr. 2624–25; 2670–73.

GOTTI: I wouldn't take nothing from him. He's gonna get killed because he, he disobeyed coming.

Gx 304.1A; 304.1A(T) 33; Tr. 2675.

GOTTI: Tommy never got to see him, see? Tommy sent for him three times he didn't come. Did he tell ya that? So, I told him how come you didn't come, you didn't go when you were sent for? Huh?

\*　\*　\*　\*　\*　\*

GOTTI: Jimmy Brown says, Jimmy Brown says it, I asked him yesterday. No. But, you see Georgie, Tommy sent for him, Tommy Gambino sent (IA) three times. Now who are you not to go there. He says the reason I didn't go, I called Tommy Bilotti, Tommy Bilotti says well at your discretion, this cocksucker and ah, I don't know, at your discretion and if you got any heat at all.

\*　\*　\*　\*　\*　\*

GOTTI: Oh, not only that. He told him don't worry about what Tommy Gambino says, Tommy Bilotti. I said, that's why he got sick, talking that way....

Gx 701.1B; 701.1B(T) 156–157. "Got sick" means got killed. Tr. 5729.

GOTTI: ... the liaison, the liaison guy's getting "whacked." Because ...

\*　\*　\*　\*　\*　\*

GOTTI: ... that's not, that don't belong to us. That's their fucking "crew." And he's gotta get "whacked." Because he's getting the same, for the same reason that "Jelly Belly's" getting it. You wanna, you wanna challenge the "administration," we'll, we'll you will meet the challenge. And you're "going," you motherfucker!

Gx 302.1C; 302.1C(T) 89E. "Jelly Belly" is Louis DiBono. Tr. 4211

Those words are chillingly plain and Gravano's testimony was not needed to make them understandable. They sufficed, without more, to convict them of the murders of DiBernardo and DiBono and Milito.

The conspiracy to murder Gaetano "Corky" Vastola and the protocol required to be observed when a member of another organized crime family is to be murdered, is vividly portrayed in Gx 302.1C; 302.1C(T) 9–44, a conversation electronically captured on January 24, 1990 in which the participants were Gotti, Gravano, Locascio and John

D'Amato. That conversation would have sufficed, without more, to convict the defendants of conspiracy to murder Vastola and it would just as certainly have sufficed to convict Gravano of that conspiracy had he remained a defendant in the case.

### 3. The Gambling Counts

The evidence of the extensive involvement of the Gambino Organized Crime Family in illegal gambling businesses in New York and Gotti's significant role in them did not require the testimony of Gravano. Gotti's conviction was assured by his own words, captured electronically during the course of a conversation in the hallway adjacent to the Ravenite Social Club on January 18, 1990 between him and Peter Mosca, a soldier in the Gambino Family who had been operating an illegal gambling business in Astoria, Queens. Spiros Valentzas, "the boss of the Greeks," Tr. 2128, attempted to open a baccarat game in the vicinity of the Gambino Family chemin de fer game. Peter Mosca came to Gotti for assistance in eliminating that competition. The brief excerpts of that conversation, set out here, required no testimony from Gravano to explain:

GOTTI: ... That whole thing, first time you've heard this guy's name in a fucking year. Pete, what's this guy.... First time in a fucking year. And you've got a game, we got a game ... for years there.

MOSCA: That's right.

GOTTI: About twenty (20) years.

\* \* \* \* \* \*

GOTTI: We got a game there for twenty (20) years. Is this rat-fucking Greek's name Spero?

MOSCA: That's right.

GOTTI: You tell this punk, I, me, John Gotti ...

MOSCA: I'm meeting him tonight.

GOTTI: ... will sever your motherfucking head off! You cocksucker, you're nobody there.

\* \* \* \* \* \*

GOTTI: "Listen to me," tell him. Tell him, "Listen, you know better. He'll sever your motherfucking head off! You know better than to open a game there." Gx 400.1A; Gx 400.1A(t) 131–32; Tr. 2127–29.

### 4. Obstruction of Justice

The intercepted conversations between and among Angelo Ruggiero and Pete Tambone, Gene Gotti, Vittorio Amuso, a member of the Lucchese Crime Family (Tr. 5614); Eddie Lino; Mike Coiro; John Carneglia; Jack Conroy, received in evidence as Gx 100.1; 102.1; 103.1; 104.1; 105.1; 106.1; 107.1; 108.1; 109.1, 110.1; 111.1; 112.1; 114.1; 115.1; 116.1; 118.1; 119.1; 120.1; 121.1; 122.1 provide irrefutable evidence of the drug trafficking in which Angelo Ruggiero, John Carneglia, Eddie Lino and Gene Gotti were engaged as well as irrefutable evidence of the efforts to obtain confidential law enforcement information for the purpose of frustrating the investigation into this criminal activity. The evidence thus presented provided significant background for the impetus which impelled Gotti to murder Paul Castellano. What is significant to note regarding the foregoing conversations is that Gravano was not a party to any of them and his testimony was not necessary to either establish or explain their significance.

The charges pertaining to conspiracy to obstruct justice and to the obstruction of justice were also convincingly established by intercepted conversations which would have as effectively resulted in Gravano's conviction had he remained a defendant. Those conversations were received in evidence as Gx 301.1b; 404.1B; 504.1A; 408.1A; 505.1B; 409.1A; 701.1B. In all of those conversations, except one (301.1B), Gravano was neither a participant nor present. Such testimony as was elicited pertaining to those intercepted conversations came not from Gravano, but from Special Agent Lewis Schiliro. Tr. 5612–5731; 5753–5920.

The obstruction of justice counts did not require a single syllable to be uttered by Gravano to convict Gotti and Locascio. The tape recorded conversations between John Gotti and Michael Coiro, Gx 303.1E; Gx 303.1E(T); the tape recorded conversation between Gotti, Gravano, Corrao, Helbig and Locascio, 301.1B; Gx 301.1B(T); the tape

recorded conversation between Gotti and Helbig, 404.1B; Gx 404.1B(T); the tape recorded conversation between John Gotti, Frank Locascio and Jack D'Amico, Gx 504.1B; Gx 504.1B(T); the tape recorded conversation between John Gotti and Louis Vallario, Gx 408.1A; Gx 408.1A(T); the tape recorded conversation between John Gotti and George Remini, Gx 505.1B; Gx 505.1B(T); Gx 505.1 C; Gx 505.1C(T) provided overwhelming evidence of guilt on those counts. Other evidence of obstruction of justice was vividly captured on tape recorded conversations between Angelo Ruggiero and John Carneglia, Gx 118. 1; Gx 118.1(T); Angelo Ruggiero and John Conroy, Gx 119.1; Gx 119.1(T); the tape recorded conversation between Angelo Ruggiero, Michael Coiro and Gene Gotti, Gx 120.1; Gx 120.1(T); Gx 121.1; Gx 121.1(T); the tape recorded conversation between Angelo Ruggiero and Michael Coiro, Gx 122.1; Gx 122.1(T). The testimony regarding these tape recorded conversations can leave no doubt that obstructing justice and frustrating investigations was an ongoing concern of the enterprise, *see* Tr. 5612–5714, and Gravano's testimony was not needed to prove it. References to the corrupt New York City Detective who was supplying confidential information to Gotti through Peter Mavis, George Helbig and Joseph Corrao and identified by name, Peist, Tr. 5665, was subsequently validated by his (Peist's) pleading guilty to participating in the affairs of a racketeering enterprise through a pattern of activity which included accepting benefits to influence his duties as a public servant, obstructing justice with respect to the Castellano murder investigation, the Gambino Family investigation and others. *United States v. William Peist*, Cr–91–1343(S–1)(ILG). The proof beyond a reasonable doubt of the obstruction of justice counts charged in the indictment was vividly presented through the tape recorded conversations of the parties to them and which are listed above and in which the testimony of Gravano played virtually no role.

The testimony given by Gravano regarding obstruction of justice related to the previous trial of John Gotti in this courthouse and not charged in this indictment. In that testimony he related the events surrounding the bribery of a juror in that trial, George Pape, which resulted in Gotti's acquittal. There was other circumstantial evidence adduced corroborating his testimony, Tr. 6195–96, and subsequent events conclusively validated it. George Pape was tried and convicted of conspiring with John Gotti, Gene Gotti and Salvatore Gravano and others, to corruptly influence and impede a petit juror in the discharge of his duties in the case of *United States v. John Gotti*, CR–85–178, and of the substantive count of influencing and impeding the juror.

### B. *The Tax Count*

The amount of monies received by Gotti as the boss of the family is staggering. The record is replete with references to sums he received in that capacity and only a few, which have been culled from that extensive record, should suffice:

GOTTI: ... I was Marine Construction ... it's my company.

Gx 304.1A; Tr. 2645.

GOTTI: Frankie [Locascio], the guy gives Joe Watts 9,000 every two weeks. He takes a third and I get two-thirds. Don't I get 2,000 a week? Don't I get 2,000 a week pay?

Gx 304.1A; Tr. 2647.

GOTTI: And DiB and the other guy, and I said, Sammy, you got one, a lump one, these guys. We grabbed hundred thousand, we got ah—20,000 went to Bobby Sasso ... three ways I got maybe 20 or 25,000.

Gx 304.1A; Gx 304.1A(T) 62–63; Tr. 2696–97.

GOTTI: Well let me say something to you Frankie, a minute. The monies didn't change. Like he said to me, like it was about ten weeks, he turned in, he turned in two-ninety. He said, "I turned in two-ninety." He didn't turn in two-ninety. He turned in sixty-three thousand (63,000) was my birthday money! Youse gave that to me as a birthday present. Am I correct Frankie?

LOCASCIO: Right.

Gx 304.1A; Gx 304.1A(T) 64; Tr. 2697–99. The phrase "turn in" refers to money that is turned in to the boss. Tr. 2698.

GOTTI: ... I went partners with a company that I put into business five years ago, Albie Trimming, when Paul was alive. And I just now got on the fuckin' payroll. I'm trying to keep my ass out of fuckin' jail, no other fuckin' reason.

\* \* \* \* \* \*

... the only thing I'm on paper. I get forty thousand a year from the ... plumbing, we get, ... a thousand a week from ah, ah (IA).

LOCASCIO: You're down for a hundred a year.

GOTTI: Nah, that's it, Frank.... Just now tax purposes eighty-five thousand. At Easter and I'll be like at a hundred twenty-five or thirty-five thousand; is good for me, Frank.

LOCASCIO: You don't ... you don't spend more than that shows.

Gx 304.1A; Tr. 2702–04.

Not a syllable has been uttered by Gravano who was not present during that conversation between Gotti and Locascio. Those excerpts together with many others found in the record, convincingly established his guilt on the tax count.

Substantial additional evidence dispersed throughout the record, much of it from Gotti's mouth, established the substantial sources of income he enjoyed and proved his guilt on the tax count beyond a reasonable doubt. For example,"... Jackie Nose, I give him, every week out of my pocket. Every week, Frankie. Every week he gets $2,000." Tr. 2679. The intercepted conversations left no doubt that the Gambino Family controlled Local 23 of the Mason and Tenders Union, Tr. 2643–44; controlled a significant portion of the carting industry, Tr. 2663–66; Local 282 of the Teamsters' Union, Tr. 2622–26, 2748; the concrete business, Tr. 2740–45, and others. *See also.* Tr. 6308–86. Not a word of testimony from Gravano was needed to prove that count.

The foregoing overview of the evidence presented at the trial of John Gotti and Frank Locascio has been painstakingly undertaken by me for the purpose of evaluating the validity of the assertion, repeatedly made in the many motions for a new trial that have thus far been brought on behalf of both, that Gravano's testimony was indispensable to their conviction and that the Castellano murder was the centerpiece of their prosecution. The record resoundingly belies both contentions.

## IV. *Perjury and Impermissible Vouching*

I will now address what is most vigorously pressed in every motion thus far made by both Gotti and Locascio and with particular vigor in those now before me, namely, that Salvatore Gravano perjured himself at trial; that the government knew and permitted him to do so, and that the government's misconduct was compounded by frequent references to Gravano's cooperation agreement by which he was obligated to tell the truth as a significant factor to be considered by the jury in assessing his credibility.

The progression of that assertion begins with a reference to the cooperation agreement between Gravano and the Government. The first of many references to that agreement is found in the opening statement of Gotti's counsel who represented that "[w]e will prove ... that the government engaged in the equivalent of a body snatching trade, that they are trading in currency, so to speak, dead people for testimony .... [y]ou will see that the deal ... contains an arrangement ... that if Mr. Gravano testifies, quote, truthfully that his cooperation will be made known to the sentencing judge, which will assist the sentencing judge in the imposition of whatever sentence may be imposed upon him." Tr. 1568–69.

Counsel for Locascio continued in a similar vein, viz: "Mr. Gravano got his absolution from the government in order to come into this case." Tr. 1602. "Gravano knows the only deal he can make that is going to get him what he wants, which is absolution from the only people who can give it to him for his 19 murders, ... but he knows one thing. He has to give them something they don't have solid." Tr. 1609.

Repeated emphasis is then placed upon the obligation imposed upon Gravano by the terms of that agreement to tell the government about all the crimes he had committed

in the past and the contention that he breached that agreement by not having done so. The event which is vigorously asserted as a flagrant breach of the agreement and proof of Gravano's perjury is one which it is claimed, was learned for the first time in connection with the subsequent prosecution of Pasquale "Patsy" Conte, ("Conte") and thus claimed to constitute newly discovered evidence.

The validity of those assertions can only be tested against the record and will be addressed in two parts.

### a. Did Gravano Breach His Duty to Fully Disclose his Past Crimes?

At the outset I would note that it is curious to consider the tenacity with which defense counsel pursued Gravano on his cooperation agreement when they objected to it being received in evidence when offered by the government. Tr. 3948. I speak of "they" although the objection was voiced by Locascio's counsel because even the most objective reading of the entire trial record could lead only to the conclusion that there was an implicit, if not an explicit, joint defense attack mounted against the indictment. (*See* Tr. at 4304 which recounts that John Gotti considered a replacement for one of the attorneys who was disqualified. When asked whether it mattered who that person would represent, Gravano or Locascio, Gravano testified that it would not because "[i]t was one defense team, anyway. It didn't matter who he represented," he answered to Gotti, in any event. That testimony was unrefuted). *See also:*

GOTTI: I'm trying to think what's good for the overall picture, Sammy. First thing is this. With these fuckin' lawyers on all these cases like, even for a bail application, they gotta go in there, argue for your client, within certain parameters. Then after that, keep your fuckin' mouth shut. Like these guys, when Barry Slotnick got up on bail, on the bail hearing, "Your Honor, those charges don't pertain to my client." sit the fuck down, or I'll knock you down. .... Talk within certain parameters, and

we'll win, we'll win. We'll win, Sammy. We'll win these fuckin' cases.

Gx 303.1A; 303.1A(T).

GOTTI: ... So, he should'a spoken from there for himself There's reasons why we don't say nothing. We're, we're sworn not to say nothing. Even when we're, we're 100 percent innocent, we're sworn not to say nothin'. And you sit there and take it on the chin.

Gx 501.1A; Gx 501.1A(T).

CUTLER: ... But a majority of these lawyers, who you look at, are known as erudite, professorial, ah, "egghead" types. Will not put in the brief, words to the effect, "Go fuck yourself!" I know you can't do that. But they will (tap sound) not put it in a brief, this, "And we, we dispute the existence of the Mafia." I say it all the time. They won't write it down. They, they just won't write it down.

GOTTI: So, don't let them do our work, then. Don't fuckin' work!

CUTLER: They ... No, I'll put it in, John. Write it in.

GOTTI: That's all. That's the way I want it.

CUTLER: I understand.

GOTTI: (IA) or nothing.

CUTLER: No, I understand that.

Gx 502.1A; Gx 502.1A(T).

Gravano acknowledged his agreement to tell the truth and detail his criminal past. He acknowledged his understanding that it was in his "best interest not to get caught in any kind of a lie, and not to admit it. For me not to admit it and get caught in a lie, then the ... government would be able to prosecute on everything I did admit to and what they found out about." Tr. 4384. That testimony, elicited upon direct examination, was vigorously and intermittently pursued upon cross examination by counsel for both Gotti and Locascio. Relevant portions of those cross examinations have a significant bearing on the · question here being addressed and are therefore, set out *in extenso:*

*Cross Examination by Gotti:*

Q. Now, is it not your testimony, is it, that in those debriefings, you told the prosecution about every single criminal act that you had committed?

A. I believe I did.

Q. You did?

A. Maybe not in detail, but I believe I did.

\* \* \* \* \* \*

Q. You are telling us that you detailed all your crimes?

A. No, I didn't detail them all.

Q. You made a list of all the crimes that you could remember, in effect, orally or in writing, in those couple of days?

A. Yes.

Q. All right. And you left none out?

A. To the best of my recollection.

Tr. at 4555–56.

Q. I am talking about covering all the general disclosures on your part about your criminal life, right?

A. They were looking to be debriefed on the ceremony, on my life-style and what went on in the past, constantly debriefing.

Q. Asking you for more and more information in regard to your criminal activity, correct?

\* \* \* \* \* \*

A. Yes.

Q. And if it comes to pass you remember a crime you forgot you tell them about it?

A. Yes.

Q. When you remember a crime that you had forgotten you tell them about it, you expect not to be prosecuted for the disclosure of that criminal act regardless of when you disclosed it, correct?

A. I would imagine if I left out a detail in good faith that there is a possibility nothing would happen from it.

Tr. at 4566.

\* \* \* \* \* \*

Q. When Mr. Gleeson was asking you questions concerning whether the gov-

ernment knew of these various murders, you were responding that you told them and you plead guilty in order to get them behind you, right?

A. Not really.

\* \* \* \* \* \*

Why I did it again was back to the agreement with the government. I was supposed to be debriefed, tell the truth, not withhold anything.

It wouldn't be in my best interest to hide something from the government at this point. Once I went into the arrangement to tell the truth what would be my purpose to hide something. It would only come back to haunt me.

Q. Right.

That is to your interest to disclose anything that could come to your door, anything that could be hung on you because you wash your past clean with this plea, is that correct?

A. Yes. It wouldn't pay me to lie.

Tr. at 4568.

*Cross Examination by Locascio:*

Q. When you were questioned by Mr. Krieger though, and as you've just seen, you told him, did you not, and you said that it was true, that after you had signed the first agreement, November 13, and in between that period and December 5, at a time when you know everything is covered as of December 5, you told the Government, you disclosed crimes to them during that period of time for the first time, in other words, things they didn't know about before November 13, things that are covered by the December 5 agreement, but things that you had not disclosed before November 13.

True?

A. I really don't know.

Q. You don't know?

A. I don't know the answer to that question.

Q. Well, either as you sit here today, you have a recollection as you sit here today consistent with what you testified to on

March 6, 1992, that there were crimes which you had not yet disclosed to the prosecution as of the date you signed the plea agreement on November 13, either that's correct or it's incorrect?

A. I was continuously being debriefed and we were plugging in my lifestyle as I recalled it, and I told the truth at that time, and I go on—I'm not too sure of the dates, and I'm not sure of what covers what, but that's what I did with my plea agreement and that's what I continuously do.

Q. I'm not even questioning you about what covers what. So we understand again each other, as far as you in your mind are concerned, as of December 5, 1991 in this court when you pled guilty to that information, anything that you had told the Government up to that point was covered by the agreement, we understand that, or you understand that, rather?

A. I believe at that time I have told them just about everything, yes, everything to my knowledge, my memory.

Tr. at 5040–41.

Those excerpts make obvious two facts which are critical in any assessment of the underlying premises of the defendants' motions and make obvious too that their premise is flawed: (1) The debriefing of Gravano was not completed during the short period between his agreement to cooperate and the trial. The tacit recognition by Gotti of the improbability that Gravano could relate the entirety of his criminal activity in that brief interval is inherent in the question noted above, even a reading of which communicates the tone of incredulity: "You made a list of all the crimes that *you could remember*, in effect, orally or in writing, *in those couple of days?*" (emphasis mine); (2) The debriefing was ongoing and continued after the trial was concluded. The credibility of Gravano's averments that in that interval he related everything he then remembered was exemplified by his testimony more than a year and a half later in *United States v. Bisaccia and Stantini*, 85 F.3d 9 (2d Cir.), *cert. denied*, ——— U.S. ———, 117 S.Ct. 498, 136 L.Ed.2d 390 (1996), over which I presided. That testimo-ny bespeaks his continuous debriefing and the depths to which he continually plumbed his memory. The essence of that testimony cannot be captured in a summary as clearly as it can by setting it out. The direct examination was as follows:

Q. At the time you testified about the Oliveri murder in the Gotti trial, did you recall that Ozzie [Stantini] was involved in the Oliveri murder?

A. No.

Q.... Could you explain to the jury how you recall today that Ozzie was involved in the Oliveri murder?

A. Well, I was debriefed about it. It was one of the homicides that we touched on. As I spoke about this hit I completely left out Ozzie, I forgot that the Ozzie was involved. I forgot to mention it. Some time later after the trial, I received a phone call from an FBI Agent Tom Petrouskie, and he asked if Ozzie Stantini knew about the Oliveri hit, and I told him I would get back to him and hung up. And I immediately remembered at that point that not only he knew, but he was involved in it, and that I forgot to say it when I was debriefed by the FBI.

Q. So what did you do?

A. The next day I thought about it awhile, next day I called up U.S. Attorney John Gleeson, and I told him what had happened. He told me that he would send down a team of people, agents or whatever, to come down and talk to me about it and find out what happened.

Q. Now, between the time you spoke to Agent Petrouski and the time that you called Mr. Gleeson, what were you thinking about?

A. What was I thinking about? I thought about how serious it would be to forget a situation like that.

I thought about how the government would react to it.

I thought of how the defense attorney would think about it and react to it, and try and possibly attack my credibility, like I was lying about it.

I thought about all of these things, and then called up the U.S. Attorney and told him.

Tr. at 228–30.

The relentless cross-examination on that testimony left it undisturbed. B.Tr. at 452–57; 473–76.[6]

Shortly thereafter, Gravano testified yet again in *United States v. Conte*, CR–93–0085 (ILG) over which I presided, and was once again cross-examined by yet another experienced and implacable interrogator on the same issue, as follows:

Q. You understood, sir, that it was your obligation to fully advise the authorities of all the crimes that you were involved in prior to the time that you pleaded guilty, isn't that a fair statement, yes or no?

A. No.

I understood that the debriefing would be a very long, very intense ongoing situation. It's still ongoing now. It's two years later.

Q. Did you ever say that before you took the plea of guilty on December 5, 1991, that you told the authorities all the crimes that you had been involved in?

Did you ever say that, yes or no?

How about that?

Did you, sir?

A. I probably told them everything I thought of within that short span of November 14th or 13th to—December 5, whatever major things, whatever I could remember, I talked about.

Q. Because—

A. At that time they told me it would be an ongoing process.

Q. You knew that if you failed to tell the authorities all the crimes that you were involved in, to the best of your ability, you stood a risk of violating the agreement, isn't that a fair statement?

A. If I deliberately?

Q. Yes.

As a matter of fact, you're somebody who has characterized your memory as a person who doesn't need any help remembering situations and things that I have done. I may need help with dates, but I don't need help with what I've done.

Did you ever say that to anybody, yes or no?

A. Probably.

Q. So you're a person who has on previous occasions said the state of your memory is such that you don't need any help remembering situations and things that I have done, you have said that before, sounds familiar?

A. Sounds like something I would say.

Q. And, sir, it wasn't until 1992, long after your plea of guilty, you pleaded guilty, to orient us, December 5, 1991, it wasn't until sometime in 1992 that you first told the authorities that you had conspired with people to murder Joey Gallo, isn't that true?

Yes or no?

A. It was something that happened twenty some odd years ago, back in my life. It's something that didn't happen with everything that did happen, the important things were out there. They were being talked about. Right now there's probably things hidden in my mind that could be sparked by a certain situation. I didn't find that as something that happened or I did but it's a memory that I have. It's like reaching back when I was in school. If you sat with me long enough and you tried to spark my memory, probably things you can dig out of it that I couldn't imagine telling you about, or thinking about.

C.Tr. 1869–72.[7]

And in *United States v. Gambino*, Cr–90–1051 (S–3), over which I also presided, Gravano was again cross-examined on that issue, as follows:

You told us a moment ago that this information which is Government's Exhibit 15, in evidence, represents the whole of

---

6. "B.Tr." refers to the transcript in *United States v. Bisaccia*.

7. "C.Tr." refers to the transcript in *United States v. Conte.*

your criminal behavior except for the armed robberies you committed in your youth, isn't that so, yes or no'?

A. There are other things that spark my memory and it's on an ongoing basis.

\* \* \* \* \* \*

Q. You said on more than one occasion that your memory is such that you have no problem in remembering situations, you've said that, yes or no?

A. That was part of my answer.

\* \* \* \* \* \*

Q. Let me ask you this, given the fact that you were obligated by your plea agreement as you understood it to give the government full and complete information with respect to all crimes that you knew about, or that you had participated in, is it not so that it wasn't until July 1992, that you told any government official of a plan that you were aware of among the so-called boss of the crime families, as you described them, to kill witnesses in a projected federal case known as the windows case? July 1992, the first time, the first time you ever mentioned that?

A. I believe so.

Q. And you kept from the authorities, did you not, from the period of November 8th, I believe when your cooperation started in depth?

A. Yes.

\* \* \* \* \* \*

Q. You told us before November 8 and November 13 you were fully debriefed?

A. I wasn't fully. It was an ongoing situation. It was impossible for me to remember my entire lifetime in the mob within that short period of time. talking about a matter of days.

G.Tr. 793. 795–96.[8]

The less than candid thrust of all of the relentlessly unyielding cross-examinations on this issue and the uncontrovertible veracity of Gravano's testimony in this regard is demonstrated by the record. The salient portions of his plea agreement do not provide

that he has informed the government that as of its date. November 13.1991. he disclosed every detail of his criminal past. Those provisions are:

3. a. SALVATORE GRAVANO *agrees to be fully* debriefed concerning his knowledge of. and participation in, any criminal activities about which the Office may inquire. This debriefing will be conducted by the Office, agents of the FBI, and other law enforcement agencies. as the Office may require. All documents that may be relevant to such activities and that are in the possession, custody or control of SALVATORE GRAVANO will be furnished to the Office. (Emphasis added).

\* \* \* \* \* \*

6. SALVATORE GRAVANO must at all times give complete. truthful and accurate information and testimony, and must not commit, or attempt to commit, any further crimes whatsoever. . . .

Studiously avoided in those cross-examinations were significant portions of the proceedings on December 5, 1991 at which Gravano pleaded guilty and the transcript of which the defense attorneys had in every case in which he testified. In the course of the plea allocution, I reviewed in detail the terms of the plea agreement with Gravano. The record of that allocution reflects the following:

THE COURT: . . . And this agreement covers only those criminal acts that you told the United States Attorney's Office about as of the date of this agreement.

\* \* \* \* \* \*

MR. GLEESON: Your Honor. may I briefly add something?

THE COURT: Please.

MR. GLEESON: As you just read the agreement, it covers criminal acts that were disclosed to the office as of the date of the agreement, which is dated November 13.

I can—I am happy to report to the Court that that—in effect it covers all activity disclosed to the office *as of today* as well. Because Mr. Gravano has

8. "G.Tr." refers to the transcript in *United States v. Gambino.*

been forthright with the government from the outset about the nature and extent of his criminal activities. (Emphasis added).

Tr. 32–33.

■ Two facts are patently clear from the foregoing: (1) Gravano has agreed *to be* fully debriefed and (2) he has been forthright as to his criminal activities to the extent that he has been debriefed about them up until December 5, 1991. The record does not support the insinuation subtly planted in every cross-examination that Gravano revealed every jot and tittle of his criminal past as of any specific date.

### b. Did Gravano Commit Perjury?

The foregoing notwithstanding, a complete response to the question being addressed, namely, Did Gravano Breach His Duty to Fully Disclose His Past Crimes, requires a critical examination of the repeatedly advanced contention that Gravano did breach that duty and in doing so, committed perjury when he testified that he was not a drug dealer. An understanding of a theme that surfaced from time to time throughout this trial and which the defendants desperately tried to mute, is necessary for a fair and objective assessment of and response to this contention which has been the focus of every motion for a new trial. including these, that the defendants have filed. Such an understanding is also necessary for a fair and objective assessment of the contention that the government withheld impeachment material in violation of their *Brady* obligation and knowingly suffered Gravano's testimony which the defendants contend was perjured, to be placed before the jury.

The many crimes with which the defendants were charged did not include a violation of the drug laws in any respect. Throughout the trial. the defendants emphasized that point repeatedly, vociferously objected to any testimony which suggested that the defendants were involved in any drug offense, and requested the court on more than one occasion to instruct the jury that narcotics trafficking is not one of the issues before them. Tr. at 1991–92; 5375–78. 7325. The defendants not only objected to such

testimony, they repeatedly sought to emphasize that Gotti was against drugs, and indeed, in his opening statement to the jury, he asserted that he had devoted his life against drugs, Tr. at 1573. He also elicited an acquiescence from Gravano that he knew "as an absolutely unquestioned fact that John Gotti is dead set against drugs." Tr. at 4438. The claim of perjury leveled at Gravano and the accompanying claim that the government permitted him to give perjured testimony at trial is based essentially on the following two questions and answers during the cross examination of Gravano by Gotti:

Q. The drug situation, you've got a stand against drugs, haven't you?

A. Yes.

Q. And have a principle that are against drugs. right?

A. Yes.

Tr. at 4437.

The assertions that Gotti devoted his life against drugs can only be described as cynical at best and downright false, at worst—as the evidence not from Gravano, but from Gotti himself overwhelmingly established. And insofar as Gotti elicited from Gravano the responses set out above, the conclusion that inevitably follows as will subsequently be made clear is that Gotti did not believe the response to be false.

#### (1) *Gotti's Drug Principles*

The evidence revealed the existence of an agreement between the bosses of the Gambino and Genovese Families that if any member or associate of either Family is found to have dealt in narcotics he will be killed. Gx 104.1: 104.1(T): Tr. 3030–31. That rule was more honored in the breach by Gotti. The life of Peter Tambone, a drug dealer, who was to be killed upon orders from Paul Castellano, the then boss of the Gambino Family, was saved by John Gotti. Gx 102.1; 102.1(T); Tr. 3262–68.

Extensive conversations, intercepted in the home of Angelo Ruggiero, between Ruggiero, Eugene Gotti and John Carneglia, describe major narcotics dealings in which they, all members of the Gambino Family and members of John Gotti's crew, were involved. Tr.

3030–3100. Gotti was aware of it, Gx 201.1, Tr. 3278, 3123, as he was aware of everything that goes on in the Gambino Family. Tr. 2642. Castellano wanted the tapes of those conversations which Ruggiero resisted giving him, a resistance that John Gotti endorsed. Tr. 3278. The knowledge of this drug trafficking did not deter John Gotti from promoting some of them who were involved in it to the rank of Captain in the Gambino Family not long after he became boss. Tr. 3282–86. The excerpts from intercepted drug related conversations captured on tape can be multiplied in profusion. I will, however, add just one Snippet more which is telling. It occurs in the course era conversation between John Gotti and Frank Locascio on December 12, 1989 in which Gotti says: "This fuckin' cripple downstairs, Jackie Nose. I give him every week out of my pocket, every week, Frankie. Every week he gets $2,000. Where do ya think I get it from … the mulberry bush? *That junk business?*" (Emphasis mine). Gx 304.1A. "Junk" means drugs. Tr. 2678, 3979.

### (2) *The Alleged Perjury by Gravano*

The assault upon Gravano's credibility has been prompted by his testimony elicited by Gotti in the Gotti trial. set out above, that he has a stand, a principle. against drugs and by his testimony to that effect in a subsequent trial over which I also presided. *United States v. Pasquale Conte,* CR–93–0085. Because it is that latter testimony which can fairly be said to be the seed from which grew the allegations of perjury made and rejected in prior motions and the allegations now before the court, it is appropriate that the relevant portions of that testimony be set out. The following was elicited from Gravano at the Conte trial on direct examination by the government:

Q. Did you have personal conversations with Patsy Conte about drugs?

A. Yes.

Q. And where did you have these conversations?

A. Outside the Ravenite Club. In the street.

Q. Do you know approximately when you had these conversations. and if you can use as a bench mark you said you were arrested in December of 1990. about when in relation to that?

A. A couple of months before. Sometime before.

Q. I'm sorry? You said how many months? Approximately?

A. A couple of months. It could he four, five months.

Q. How did it come about chat you had these conversations with him?

A. I was talking with John Gotti. It was known to us that Patsy Conte gave Paul Castellano, our previous boss. large sums of money. At one point. he had given him a Rolls—a Mercedes Benz as a gift. I don't know if it was Christmas or his birthday or something. sonic sort of a gift.

John Gotti said that since we took over, he wasn't earning with him, in this capacity. He told me to approach him, talk to him off the record, give him some sort of tacit approval, get some money off him. What he was doing with Paul, he should be doing with him.

Q. When you say what he was doing with Paul?

A. What Patsy Conte was doing with Paul Castellano, as far as giving him money, he wanted to happen with him, meaning John Gotti.

I approached Patsy Conte. I took a walk with him. I told him I was aware of the Castellano thing. I told him that it wasn't an investigation. I wasn't investigating him for doing drugs or being in the drug business. I told him to follow my conversation. I told him that we knew that he had Paul had earned big money with him.

He acknowledged that.

He told me since John took over, that he had stopped and that he assured me that he didn't do anything during the period that we took over.

He was a little nervous about the conversation I think.

I told him that whatever he was doing we wanted it to happen again under John. John had troubles with courts and lawyers and the administration was

broke and we needed some money and I more or less gave him a tacit approval to go back and start his drug operation or whatever he was doing then.

I told him I didn't want to know the details of his business. All I wanted was money for John. I told him not to approach the boss with any conversations. Just talk to me. and he accepted that conversation and left.

Q. When you told him that the administration was broke, was that—was that literally true?

A. No. It was far from true.

Q. Did you have any subsequent conversations with Patsy Conte after this one?

A. Yes.

I had a conversation with him where he told me a fellow in his crew named Cheech, who was a friend of ours. a made member in our family, would have to go and make a trip to Italy, to resume the operations, to start them up.

I told him I didn't care what he did. And whatever he had to do, to do it. He took Cheech down to the club. At one point, in another—in another meeting, and he took a walk with me and Cheech.

Cheech explained to me that he had gone to Italy. He spoke with a boss in Italy. Right now they were having their troubles in Italy between a war and the police. It was about to—it was going to resume. They needed a little more time.

I stopped him. Before he got into heavy conversations, talking about drugs, I took Patsy on the side. I told him I didn't want to talk to anybody and I didn't want to talk about drugs and I didn't want to go into the drug business. I just wanted money.

Patsy basically accepted that conversation and that was the end of that.

It never happened. It never materialized.

Q. When you say' it never happened, what do you mean?

A. We never—we never exchanged any monies. We never started up the busi-ness. We had our problems with the law. I went on the lam. I got pinched after that. And as far as. to my' knowledge. it never—we never transacted the money. I don't know if he succeeded starting the business or not. I really don't know.

Q. Now. you mentioned that at some point Patsy Conte brought Cheech down to the club.

Do you remember approximately—let me rephrase that.

Do you know about—is there a festival in Little Italy. called the Saint Genaro Festival?

A. That meeting I recall because there was a feast. When he took Cheech down.

Q. You say a feast. What fast was it?

A. The Saint Genaro's feast down in New York.

Q. Was the conversation sometime around the time of the feast?

A. Yes.

Q. Now, when you had these conversations with Patsy Conte and with Cheech, were you giving an official okay, were you on the record with Patsy Conte and Cheech?

A. No. It was an—

Q. Off the record?

A. It was an off the record okay. We wouldn't verify to any people that we were okaying this situation, but he knew that if he got in trouble or got caught, obviously he wasn't going to get in any trouble.

Q. You had mentioned that you told him just to deal with you. Is there a reason for that?

A. Yes.

Because openly we were basically against drugs, the drug business. We weren't against the dollars that that brought in from certain—this area. In John's mind, in my mind. we were shaking down a drug dealer basically.

Q. Do you consider yourself a drug dealer?

A. No.

Q. You had mentioned yesterday that you had a—by the time you were arrested you had an extensive loanshark business. Do you remember that?

A. Yes.

Q. Did you understand that any part of that money was being used by people in your crew to—in connection with drug dealing?

A. Sure. It could have been.

Q. Did you think you were a drug dealer because of that?

A. No.
You have to understand the mob, half of the mob, maybe three-quarters of the mob is in the drug business at one time or another or one capacity, at one time or another. And they borrow money. I am loansharking, I lend money. I don't care what they do with the money. All I care about is they pay me the interest and the principal back eventually. I am not unaware that a lot of these people might have used my money to buy drugs or to do drugs and that's part of—that's part of our existence in—in the mob. That's what goes on. It's just—itself part of our life.

Cross examination by Conte was as follows:

Q. You told us on direct that you take a stand against drugs: is that not so?

A. I didn't say I take a stand against it. I said I don't like drugs or dealing in drugs myself.

Q. You have a principle. I'm asking only about your principle. You have said on one or more occasions that you have a principle against drug dealing. Have you ever said that?

A. I don't know. I don't have have a principle against drugs, and what I was dead against was someone using drugs. somebody—two people in my crew who did murders became crack addicts. I have to react to it, it forces my hand to react to it.

Q. On no occasion have you ever said. as far as your personal principles are concerned, you take a stand against drugs, you have a principle that you, Salvatore Gravano, are against drugs. You don't recall ever saying that or you do recall saying that?

A. Was I asked that question and said, yes, or did I actually make that statement?

Q. Do I understand that when somebody asks you a question and you answer it, yes, you understand that you are agreeing with the question?

A. But it may not be my wording. A lot of things you ask me, I say yes; it's not my wording. If you ask me at the next trial, it wouldn't actually be my wording.

Q. Do you agree with the statement that you, Salvatore Gravano, have got a stand against drugs?
Would you answer that question?

A. Yes, I'm against drugs.

Q. Do you have a principle that you are against drugs; you have said that.

A. Yes. I don't like drugs. I'm against drugs.

Q. Is it accurate to say that you have been asked that you have very strong feelings about drug dealings and your answer was "I imagine so."
I'm just helping you.

A. I do have strong feelings about drugs and drug-dealing.

Q. Now, sir, were you asked whether there was any drug-related conversation that you had in or about the Ravenite Club?

A. Yes.

Q. Is it not true that you have said, "On no occasion has there ever been drug-related conversations either with you or John Gotti in or outside of the Ravenite;" remember saying that?

A. Basically, yes.

Q. And that statement, sir, that there was no drug-related conversation that you, Sammy Gravano ever had in or outside the Ravenite Club is as true today as it was when you said it previously a year ago?

A. It needs an explanation and I can explain it.

Q. Sir, did you ever say that whatever else the transcripts or conversations are

about, whatever the comings and goings of people in or out of the Ravenite to see you or John Gotti, no one was ever there to discuss narcotic dealing with either you or John Gotti.

Did you ever say that on any occasion?

A. Yes.

Q. You have said it here, sir, that there was an occasion, however, that was drug-related when you asked Pat Conte to, as you claim, resume his drug-dealing.

Did you say that to this jury; yes or no?

A. Yes.

Q. As a matter of fact, your conversation with Pat Conte on April 23rd, 1990 for the period of seven minutes was concerned with. was it not. to seeing that either he or Louie DiBono paid § 500.000 to you for moneys that you believed DiBono had robbed from you. Isn't that true, yes or no?

A. No.

Q. And the shakedown that you referred to either on direct or some other occasion to describe this meeting with Mr. Conte, this shakedown was your press. your insistence that this man who had robbed you and the corporation this second time in' ten years should be held to account for the sum of $500,000; and that was your decision as the underboss; isn't that what you told Conte; yes or no?

A. Conversation—

Q. Can you answer it yes or no?

A. It had nothing to do with that.

*　　*　　*　　*　　*　　*

Q. Sir, you told us that the rules of your organization is that you are not to deal in drugs; is that correct?

A. It's a hypothetical rule, but it's a rule.

Q. It's a rule that you followed; isn't that so?

A. Not because of it being a rule. I was against drugs, being in the drug business.

Q. Well, sir, have you looked at the indictment in this case?

A. In what case?

Q. This particular case on trial.

A. No.

Q. Did you participate in any agreement, as far as you are concerned, in any plan to import into the United States multiple kilograms of heroin; yes or no?

A. My plan?

Q. Did you participate. in your view?

A. What was in my mind?

Q. I'm asking you, yes or no if you can answer that?

A. I can't. You asked me what was in my mind. I can answer that.

Q. Sir, I'll reframe the question.

A. You don't want to hear that?

Q. No. I'm going to give you every opportunity.

Sir, did you ask anybody during your career in organized crime to import and possess with intent to distribute heroin? Did you. sir, yes or no?

A. It's not a yes or no question as far as I'm concerned.

Q. All right. I take it, sir, that you did ask somebody to furnish you with monies that would result from the importation, should it occur, of narcotic drugs?

You did, is that what you're saying?

A. Yes. I wanted him to resume what he was doing with Castellano. That's what John told me to go there for and John specifically told me we're not going in the drug business. We're giving him a tacit approval.

Q. Sir—

A. We don't want to have drug conversations and we don't want to go into the drug business.

Q. Is your injection of this drug related conversation, as you describe it, an effort by you to prejudice the jury?

A. Repeat that again.

Q. Is the injection of this drug related conversation an effort by you to prejudice law enforcement against Pat Conte, yes or no?

A. I'm talking basically about a murder of Louis DiBono. As far as the drug

conversation why would I look to put that in as far as prejudicing the jury or make it up? I'm not saying that we got drugs and we got money and we dealt it. I'm just telling you that there was a proposal put by John Gotti and myself to Patsy Conte.

Q. Was the person who you—

A. To do it. I told you that we didn't get any money from it. It wasn't done. So if I was going to prejudice the jury or lie I would say we got money or whatever the case may be.

Q. Did Pat Conte discuss with you quantities of drugs.?

A. No. I didn't have drug—

Q. Can you answer that? Did he discuss with you quantities of drugs. yes or no?

A. No. I didn't have drug conversations basically.

Q. You had no drug conversation when you say "basically" with Pat Conte, is that what you're saying, yes or no?
You just said it?

A. We sort of played with each other with words.

Q. You played with each other with words.
I think you told me that sometimes in the mob you speak with your eyes or your hands. Do you remember saying that?

A. Yes.

&ast; &ast; &ast; &ast; &ast; &ast;

Q. What signal should the jury look to? Is it that you touch your tie when you are talking to Mr. Conte?

A. As far as drugs?

Q. Yes. What is the signal?
Are you touching your chin?
Are you pulling your ear?

A. He's going to resume with an awful lot of money that's going to come to John Gotti. He's going to Italy to put this together. This is something that we know he did with Paul Castellano. I don't bring—I don't think he's bringing olive oil or cans of tomatoes and going to give over millions of dollars for that product. We are talking about obviously. we are talking about drugs. We are

near the Ravenite Club where there are bugs so you are not going to really basically, hear it more than likely, or see it unless we were up in the apartment where he felt a lot more comfortable.

Re-Direct Examination:

Q. Now, you testified on direct examination that you had discussions with Patsy Conte and Cheech at the Ravenite Social Club around the time of the San Genaro Festival.

Do you remember that?

A. Yes.

Q. Now, the proceeds from that endeavor, what you talked about, where were the proceeds to go?

A. If—to John Gotti.

Q. And when you had these discussions with Patsy Conte, did he agree to re-start his business?

A. Yes.

Q. And when he brought Cheech down, what was the purpose?

A. It was an explanation of what was done.

Tr. 2081.

Re-Cross Examination:

Q. . . . Sir, you were asked whether you had any discussions at the Ravenite Club related to narcotics. Weren't you?

A. Yes.

Q. You were asked you recall whether anybody who visited with you and John Gotti ever had any discussions related to narcotics trafficking weren't you asked that in a case in Manhattan, yes or no?

A. In a different case pertaining to different people. I was asked that question.

Q. Do you recall having been asked whether. taking all of the surveillance at the Ravenite Club. all of the goings and comings of people, whether any of that related to drug traffic? And you responded, not with you or with John. Do you remember making that statement?

A. Yes.

Q. As a matter of fact, that conversation that you had on April 23, 1990 outside of

the Ravenite Club, in which you are speaking into the ear of Pat Conte, is a time when you were, to use your words, shaking him down, is that a fair statement, yes or no?

A. It was about money, not drugs. Basically—

Q. It was about money?

A. It was about money.

Q. Money. It was about money?

A. He was to resume his business. If we—we wanted to be in the drug business, me and John, I would have been talking about the actual heroin, cutting it, the amounts. Other drug dealers.

Q. Did you?

A. No.

Q. Did he?

A. He was to resume.

Q. Did he discuss that?

A. What he did, and give the money.

THE COURT: Excuse me. The question was—

Q. Did he discuss quantities, price?

A. No.

Q. Cutting?

A. No.

Tr. 2117–18.

The accuracy of the entirety of that testimony is not in question. There has never been any contention that the portion relating to Gravano's conversation with Conte was accurate but that the portion of his testimony that the conversation was at the direction of John Gotti is not. Any doubt as to whether the conversation with Conte was as testified to by Gravano was cast upon it by Conte's lawyer who sought to have Gravano admit that the conversation was not about drugs at all, but about inducing Conte to pay $500,000 DiBono misappropriated. It is that same lawyer who now, on behalf of Locascio contends the conversation to have been drug related.[9]

I have suggested above that the conclusion that inevitably follows from the testimony elicited from Gravano is that Gotti himself did not believe it to be false. Neither Gotti nor Gravano were addicted to drugs as were DeBatt and Mormando who were murdered for that reason, Tr. 43 15–16, 4382–83, nor were either Gotti or Gravano dealers in drugs as were Ruggiero, Gene Gotti, Carneglia, Eddie Lino and Peter Tambone. Not being in either category, they did not regard themselves as drug dealers. They honestly believed or deluded themselves into believing that there was a distinction between actively dealing in drugs and reaping the benefit from those who did by "shaking them down" or receiving the tribute that flowed up to the boss from the assorted crimes committed as a matter of course by the captains and the soldiers. In the "mobonics" of organized crime. one can be against drugs and simultaneously receive the money that trafficking in drugs yields. That quite simply and convincingly explains why Gravano can agree that John Gotti was against drugs and say that he was too. A discussion of the applicability of the principle that Gravano was acting merely as Gotti's messenger in relaying instructions to Conte to resume his heroin activity and could not therefore be culpable of drug dealing will not be undertaken in light of the foregoing. *See, e.g., Adams v. United States,* 220 F.2d 297 (5th Cir.1955); *United States v. Sawyer,* 210 F.2d 169 (3d Cir.1954); *People v. Roche,* 45 N.Y.2d 78, 407 N.Y.S.2d 682, 379 N.E.2d 208, *cert. denied,* 439 U.S. 958, 99 S.Ct. 359, 58 L.Ed.2d 350 (1978). Nor will a discussion be undertaken as to whether at best, Gravano should be held to an understanding of the intricacies of aiding and abetting or of facilitation and thus have regarded himself and John Gotti as drug dealers.

#### c. The Brady Violation

I turn now to the assertion that the conversation between Gravano and Conte was "newly discovered" within the meaning of Rule 33, Fed. R. Cr. P.. and was deliberately

---

9. It is that same lawyer who, in representing a defendant in another case in which Gravano testified on behalf of the government, exhorted the jury to believe Gravano when his testimony exculpated his client, who now contends that he is a perjurer. *See* G.Tr. 1540–47 and *United States v. Gambino,* 835 F.Supp. at 83–85.

withheld with the intent to conceal it from the defendants in violation of the government's *Brady* obligations. The defendants certainly knew that they were significant members of "the administration," the hierarchy of the Gambino Crime Family. Tr.2005–06. When the indictment in this case was returned, in 1990, and for some years before that, Gotti, Locascio and Gravano constituted the administration of that Organized Crime Family. Pasquale "Patsy" Conte was a captain in that family, answerable to the administration. He was neither indicted nor incarcerated at the time of this trial. (He was not indicted until 1993).

Attached to Locascio's Memorandum of Law as Exhibit A is an affidavit from Gleeson in which he swears that in preparing Gravano's direct testimony in this case, he prepared a series of questions which would elicit from Gravano that he, as underboss, knew that some crews within the Family were engaged in drug trafficking, Patsy Conte's crew being one of them. Those questions which will be set out below were designed, he states, to "put the defendants on notice that Gravano's role ... and liability ... as underboss of the family, embraced .... narcotics trafficking." His affidavit also reflects his belief that had he elicited from Gravano that Gotti directed him to speak to Conte and testify to the details of that conversation it would have resulted in a motion for a mistrial. That belief was validated by the vigorous and continuous g objections to evidence pertaining to narcotics trafficking and the repeated requests that the court give cautionary instructions to which reference has been made above.

During the direct examination of Gravano, the following questions were asked and answered:

Q. You mentioned that one of the rules you were told when you were made was there's no dealing in junk.
   Is that the term you used?
A. Yes.
Q. What does that mean?
A. No drugs.
Q. Was there a penalty for that rule?
A. Death penalty.
Q. Was that rule enforced?
A. Yes.
Q. In 1990 at the time you were arrested you mentioned that your role was underboss, correct?
A. Yes.
Q. Was the rule still in existence, at that point?
A. Yes.
Q. Was the rule enforced?
A. No.
Q. Did you have—what was your role as underboss? What did you do?
A. First of all. I ran the construction industry and I helped John run the Family.
   I spoke with some of the captains and took care of some of the problems in the Family.
Q. When you spoke to the captains. did you talk about their criminal activity?
A. Some of them.
Q. *Did you discuss their criminal activity with the other members of the administration?* (Emphasis mine).
A. Yes.
Q. As a result of that, did you become familiar with the criminal activity of the various crews in the Family?
A. Yes.
Q. Were any of the crews involved in dealing narcotics?
A. Not with any kind of okay.
Q. They didn't have an okay to do it correct?
A. No.
Q. Some of them were involved in it, nevertheless?
A. We assumed so.
Q. Was it overlooked?
A. Yes.
Q. Mr. Gravano, the narcotics trafficking was not sanctioned, correct?
A. No.
Q. It's against the rules?
A. Yes.
Q. Were there crews within the Family that, to your understanding as under-

boss, were, nevertheless, involved in narcotics trafficking?

A. Yes.

Q. Which crews?

MR. MITCHELL [Locascio's Lawyer]: Your Honor, I object to this entire line.

THE COURT: Overruled.

A. Johnny G's family, Patsy' Conte's crew, Eddie Lino's crew, Angelo Ruggiero's crew.

Tr. 3979–81.

The citation of just a few cases should suffice for the proposition that evidence which could have been discovered with due diligence is not newly discovered. *United States v. Sasso,* 59 F.3d 341, 350 (2d Cir. 1995), *United States v. Siddiqi,* 959 F.2d 1167, 1173 (2d Cir.1992). Gotti, as boss, and Locascio who was an underboss or consigliere since 1987, could surely have obtained from Patsy Conte the information they claim they just discovered of his conversation with Gravano, assuming that neither of them had it and Gotti plainly did.

Locascio seeks to bolster his assertions of the deception by the government vis-a-vis the Gravano–Conte conversation by annexing to his Memorandum of Law as Exhibit H an affirmation dated October 21, 1993 by an Assistant United States Attorney ("AUSA") in the Southern District, submitted in the trial there of United States against John Gambino. In that submission, the AUSA avers that at no time prior to May 18, 1993 did the Eastern District advise the Southern District of that conversation. The accuracy of that affirmation is not only unequivocally disputed by the prosecutors of this district, *see* Gov't Mem. at 13, fn.9, but its accuracy is also clearly placed in issue by a letter from the same Assistant United States Attorney to Judge Leisure with copies to all defense counsel, dated May 25, 1993, which he wrote after speaking with John Gleeson and Mary Jo White, the interim United States Attorney, nearly six months prior to his affidavit, as follows:

> Representatives of this Office and of the Eastern District had several discussions *in the summer of 1992* regarding the possible use of Gravano as a witness in this case.

[*United States v. John Gambino, et al.,* (9S) 88 Cr. 919(PKL)]. During those discussions the Eastern District informed this Office that Gravano had had a limited number of conversations regarding narcotics trafficking with other members and associates of the Gambino Family.... *In addition, AUSA Andrew McCarthy has informed me that Pasquale Conte was identified by the Eastern District at one of those meetings as one of the people with whom Gravano had had a conversation concerning narcotics....* (Emphasis added).

*See* Exhibit I annexed to Locascio's memorandum of law.

#### d. Vouching

The defendants, charging the government with impermissibly vouching for the credibility of Gravano, seek to create the perception that the overwhelming emphasis in the government's summation and rebuttal was upon convincing the jury that they should believe him. I deemed it important to examine the record to determine what the facts are before addressing the applicable legal principles. That examination revealed that not a word was uttered by the government in its opening statement about Gravano's cooperation agreement. That opening was devoted rather almost entirely to the tape recorded conversations which the government believed would prove the guilt of the defendants. Indeed, it wasn't until the last two paragraphs of that opening that reference was made to the agreement between Gravano and the government in which the government said it has "no brief as to Sam Gravano ... He's no better or different than John Gotti, both of whom as a matter of course killed people in running the Gambino family...." Tr. 1547.

In contrast, the opening statements on behalf of Gotti and Locascio took immediate aim at the credibility and character of Gravano referring to him as "a little man full of evil, connivance, manipulation and vanity who has tried to clear his slate by admitting to 19 murders," and the statements continue in that vein for at least five pages of transcript. *See* Tr. 1568–70; 1573, 1587, 1599, 1602, 1607.

The contrast revealed by an examination of the record of summations is startling. The totality of the references by the government pertaining to the defendants' vouching contention are these. After referring to the tapes from the Ravenite Social Club. the hallway behind it, and the apartment above it, based upon which Gotti, Locascio and Gravano were indicted, the government said:

> Until November 1, 1991, that's what we had; that's all we needed. Those tapes convict these defendants. In late October, almost a year after the arrests, as I mentioned to you before, Salvatore Gravano, one of them, decided to quit, absolutely unprecedented, the underboss of the Gambino crime family—

Thereafter, the government said:

> I suggest to you, ladies and gentlemen, that there are . . . don't for a minute think that I am suggesting to you that you shouldn't be careful in evaluating his [Gravano's] testimony. You should. Salvatore Gravano was a major, major league criminal. You should be careful in assessing his testimony. . . .

Tr. 7364.

The government then suggested factors the jury should consider in evaluating his testimony, such as his demeanor while testifying, his responsiveness to questions, and the incentive his cooperation agreement gave him to tell the truth. told the jury:

- that there were no new charges based on Gravano, all of which were provable before he agreed to cooperate. Tr. 7368: that the jury "can and should convict on the tapes alone. I submit you can and you should convict on Salvatore Gravano's testimony alone. Together, as I've already mentioned, the proof is absolutely overwhelming." Tr. 7369–70
- Salvatore Gravano's testimony on the DiBernardo murder is not necessary because the jury has extraordinary proof without Gravano, namely, the admission by John Gotti. Tr. 7408.
- Like DiBernardo and Milito, the December 12, 1989 apartment tape, standing alone. convicts these defendants of the murder of Louis DiBono. Tr. 7423.

- Gravano had nothing to do with the murder of DeBrizzi. Tr. 7428.
- John Gotti thought he was going to get murdered. Gravano told you that in his testimony, but you don't need Gravano because John Gotti told you that. On the tapes. Tr. 7463.

In comparison, the major portion of the summation on behalf of Gotti and a substantial portion of the summation on behalf of Locascio were devoted to Gravano's credibility and to what they regarded as the outrageous irresponsibility of the government in entering into a cooperation agreement with him. Approximately 150 pages of summation transcript reflect the time and effort assigned to Gravano's character and veracity.

The only relevant reference to the subject in the government's rebuttal can be found in six lines:

> Let's go back to basics, ladies and gentlemen. These defense attorneys ranted and raved about Sal Gravano because Sal Gravano is their nightmare. He is of enormous value to us as a witness. He was their closest criminal ally. He was part of the inner circle which consisted of three people.

Tr. 7817.

■ The contention so vigorously pursued that the government impermissible vouched for its witness is quite simply neither supported nor supportable by the record.

## V. *Legal Discussion*

In *United States v. Gambino*, 835 F.Supp. 74, 85–89 (E.D.N.Y.1993), *aff'd*, 59 F.3d 353 (2d Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 1671, 134 L.Ed.2d 776 (1996), I addressed the controlling principles informing the judgment of a court in deciding a motion for a new trial brought pursuant to Rule 33. Fed.R.Crim.P. There, as here, the motion was bottomed essentially upon the claimed perjurious testimony of Salvatore Gravano and there, as here, reliance was principally placed upon cases such as *Wallach, supra; United States v. Stofsky*, 527 F.2d 237 (2d Cir.1975), *cert. denied*, 429 U.S. 819, 97 S.Ct. 65, 66, 50 L.Ed.2d 80 (1976), and *United States v. Seijo*, 514 F.2d 1357 (2d Cir.1975),

*appeal after remand,* 537 F.2d 694 (2d Cir. 1976), *cert. denied,* 429 U.S. 1043, 97 S.Ct. 745, 50 L.Ed.2d 756 (1977). It was decided there and it is decided here, that such reliance was misplaced for the reason that they taught what the required response should be to a claim that the *principal* government witness committed perjury while testifying at trial. I have set out at some length the evidence in this case, consisting largely of the words of the defendants themselves, for the purpose of demonstrating beyond cavil, that Salvatore Gravano was not the principal government witness and that had he not testified at all, the conviction of the defendants was assured.

Not directly addressed by me in *Gambino* was the assertion that Gravano's testimony at trial was perjured. In this regard too, I have set out at some length the relevant testimony not only from this trial but from other trials as well and from which the defendants seek comfort, which supports the finding I no make that Gravano's testimony as not perjured either as it pertained to his stand on drugs or to his revelations to the government of his past criminal history. Although not addressed by me at *nisi prius* the issue was addressed by the Court of Appeals and the conclusion reached there was essentially the same. In referring to the *Conte* letter, the court wrote, at 59 F.3d at 365:

> But we are unpersuaded that any perjury occurred. Gravano had stated under oath in those earlier trials of Gambino organization members that *he* and the Gambino organization had a principle of not dealing in drugs. *Yet, that policy statement is not flatly inconsistent with his having become involved on his own, and John God's. behalf in a heroin importation conspiracy.* It is at most evidence that Gravano did not adhere to the rules of the organization of which he was a high-ranking member. Nevertheless, even a direct conflict in testimony does not in itself constitute perjure. (Citation omitted) (emphasis added).

I have furnished above the basis for the conclusion that Gotti and Gravano actually believed they were not drug dealers and were not merely ignoring the rules, as well as the basis for my conclusion after carefully studying all of the evidence that there has been no showing that Gravano committed perjury and that he in fact told the truth. *See United States v. Johnson,* 327 U.S. 106, 111–112, 66 S.Ct. 464, 466–467, 90 L.Ed. 562 (1946).

My prior decision in *Gambino* fully discussed the teachings of *Brady v. Maryland,* and its progeny, namely, *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) and *United States v. Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). That discussion addressed in detail the asserted violation of the government's *Brady* obligation by withholding impeachment material. *See Gambino,* 835 F.Supp. at 85–88 which I will deem incorporated by reference and merely summarize here. *Brady* decided that the suppression of evidence which, if made available to the defendant would tend to exculpate him or reduce the penalty to which he would be exposed. violates due process regardless of the good faith or had faith of the prosecutor. 373 U.S. at 87, 83 S.Ct. at 1196. The distinction between *Brady* and this case is apparent. The evidence claimed to have been withheld here would not exculpate the defendants.

In *Giglio,* the government withheld an alleged promise to Giglio's alleged co-conspirator, the only witness linking Giglio to the crime and without whose testimony there could have been no indictment and no evidence to carry the case to the jury. The Court decided that the withheld evidence was "material" within the meaning of *Brady.* The distinction between Giglio and this case needs no explication beyond stating that Gravano was not the only witness without whose testimony there would have been no indictment as has been plainly demonstrated above. It is significant to take note of the observation in *Giglio,* particularly relevant here. that a new trial is not required whenever "a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict." 405 U.S. at 154, 92 S.Ct. at 766.

In *Agurs,* the defendant was convicted of second-degree murder. The victim died of multiple stab wounds. At trial, the defendant argued that she acted in self-defense. The prosecutor failed to disclose the victim's prior criminal record which reflected two prior convictions of assault and carrying a deadly weapon which, in each case, was a knife. The Court denied a motion for a new trial based upon that withheld evidence believing it critical to re-emphasize that the *Brady* duty to disclose is not violated unless that which has been withheld is sufficiently significant to deprive the defendant of a fair trial. Information not disclosed does not become "sufficiently significant" or "material" in the constitutional sense because there is a mere possibility that the undisclosed information "might have helped the defense, or might have affected the outcome of the trial.... Nor do we believe the constitutional obligation [of disclosure] is measured by the moral culpability. or the wilfulness. of the prosecutor ... If the suppression of evidence results in constitutional error. it is because of the character of the evidence, not the character of the prosecutor." 427 U.S. at 109–10, 96 S.Ct. at 2400–01.

Justice Stevens reiterated the *Giglio* court's rejection of the notion that the prosecutor is constitutionally bound routinely to open his entire file to defense counsel and that ever, nondisclosure should be regarded as though it were error. In language which presaged the holdings in *Bagley* and *Kyles v. Whitley,* 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), Justice Stevens wrote:

> The proper standard of materiality must reflect our overriding concern with the justice of the finding of guilt. Such a finding is permissible only if supported by evidence establishing guilt beyond a reasonable doubt. It necessarily follows that if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed. This means that the omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable valid-

ity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt.

427 U.S. at 112–13, 96 S.Ct. at 2402.

Reiterating the holding in *Agurs, Bagley* held that "a constitutional error occurs, and the conviction must be reversed, only if the evidence is material in the sense that its suppression undermines the confidence in the outcome of the trial" and that "[i]t remains to determine the standard of materiality applicable to the nondisclosed evidence at issue in this case." 473 U.S. at 678, 105 S.Ct. at 3381. The Court went on to make that determination as follows:

> The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.

*Id.* at 682, 105 S.Ct. at 3383.

The opinions in both the district and appellate courts in *Gambino* did not consider *Kyles, supra,* in which Kyles, a habeas petitioner, claimed that evidence material to his defense was withheld and that his conviction was obtained in violation of *Brady.* The evidence withheld, suffice it to say, would have cast doubt upon the identification and thus the guilt of Kyles as the murderer. The factual distinction between that case and this case is thus readily apparent.

The Court in *Kyles* sought to make plain the import of "materiality" as used in *Bagley,* as follows:

> *Bagley's* touchstone of materiality is a "reasonable probability" of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the Government's evidentiary suppression "undermines confidence in the outcome of the trial."

*Kyles,* 514 U.S. at ——, 115 S.Ct. at 1566 (quoting *Bagley,* 473 U.S. at 678, 105 S.Ct. at 3381).

Elaborating on the significance of "materiality," the Court went on to hold that "materiality ... is not a sufficiency of evidence test" and that "materiality" should be defined "in terms of suppressed evidence considered collectively, not item-by-item." 514 U.S. at —— ——, 115 S.Ct. at 1566–67.

A review of every case decided after *Kyles* by the Court of Appeals in this circuit emphasizes evidentiary suppression to be material if it undermines confidence in the outcome of the case. *See, e.g., United States v. Amiel,* 95 F.3d 135. 144–45 (2d Cir.1996): *United States v. Harris,* 79 F.3d 223, 233 (2d Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 142, 136 L.Ed.2d 89 (1996); *United States v. Wong,* 78 F.3d 73, 79 (2d Cir.1996): *United States v. Payne,* 63 F.3d 1200. 1209 (2d Cir. 1995). *cert. denied,* —— U.S. ——, 116 S.Ct. 1056, 134 L.Ed.2d 201 (1996). *See also, Wood v. Bartholomew,* —— U.S. ——, ——, 116 S.Ct. 7, 10, 133 L.Ed.2d 1 (1995). It is important to note, however, that the cases have not understood *Kyles* to have affected the settled principle that "[s]uppressed evidence is not material when it 'merely furnishes an additional basil on which to impeach a witness whose credibility has already been shown to be questionable.' " *Amiel* 95 F.3d at 145 quoting *Wong.*

Applying the standard prescribed by *Agurs* and amplified by *Kyles,* after reviewing the claimed nondisclosures in the context of the entire record which I have carefully examined, *see Agurs,* 427 U.S. at 114, 96 S.Ct. at 2402, and "[h]aving watched the jury as they listened to the testimony, and ... having [my] finger as it were on the pulse of the trial," *United States v. Williams,* 81 F.3d 1434, 1440 (7th Cir.1996), I remain convinced of the guilt of the defendants beyond a reasonable doubt and remain convinced that there was no "reasonable probability" of a different result or that "the jury might (with some nontrivial degree of probability) have acquitted the defendants had it known." *Id.* of the information the defendants allege to be true. More specifically, I have no doubt that

the confidence in the outcome of this trial has not been disturbed or undermined one whit.

The conclusion thus stated assumes that there was a violation of *Brady* which I held in *Gambino* did not occur because the evidence allegedly withheld was not material. It is Hornbook law that *Brady* is also not violated if the defendant or his attorney either knew, or should have known, of the essential facts that would permit critical scrutiny of a witness's testimony. *See Payne,* 63 F.3d at 1208: *United States v. Zackson,* 6 F.3d 911, 918 (2d Cir.1993); *United States v. Gaggi,* 811 F.2d 47, 59 (2d Cir.) (the government is not required to draw inferences from evidence which defense counsel is in an equal position to draw), *cert. denied,* 482 U.S. 929, 107 S.Ct. 3214, 96 L.Ed.2d 701 (1987). The testimony carefully elicited from Gravano by the government as to the Gambino Family administration's knowledge that certain crews were dealing in drugs, specifically naming Conte's crew as being one of them, was clearly designed to put Locascio on notice of facts that would have permitted careful scrutiny of Gravano's testimony assuming, that as a member of the administration he didn't already have that knowledge. I mention Locascio here and not Gotti because obviously Gotti, having dispatched Gravano to speak with Conte, knew all the facts. *See United States v. Helmsley,* 985 F.2d 1202, 1206 (2d Cir.1993) discussing *United States ex rel. Regina v. LaVallee,* 504 F.2d 580 (2d Cir.1974), *cert. denied,* 420 U.S. 947, 95 S.Ct. 1330, 43 L.Ed.2d 425 (1975) (Defense counsel did not call two witnesses who he thought or knew could have contradicted the statement. "In defendant's habeas proceeding, which alleged intentional prosecution use of perjury, we denied even an evidentiary hearing, because defendant could have brought out at trial the possibility that the witness was lying.")

It may also be inferred, given the close association between Gotti and Locascio already known to the jury, that to cross-examine Gravano on the Conte letter and thus reveal Gotti's involvement, to that extent, in drugs, would result in spillover prejudice to Locascio which he would have wished to avoid. *See United States v. Provenzano,* 615

F.2d 37, 49 (2d Cir.), *cert. denied,* 446 U.S. 953, 100 S.Ct. 2921, 64 L.Ed.2d 810 (1980). The strength of that inference is made manifest by the vigorous objections to any mention of drugs repeatedly made by the defendants. *See also, Helmsley,* 985 F.2d at 1209.

I will not belabor this opinion with the multiplication of citations for the proposition that "new evidence" which is merely cumulative or impeaching is not an adequate basis for the grant of a new trial. *See Mesarosh v. United States,* 352 U.S. 1, 9, 77 S.Ct. 1, 5, 1 L.Ed.2d 1 (1956). Here, too, the Court of Appeals addressed the issue in *Gambino,* 59 F.3d at 366 when it wrote that given Gravano's extensive criminal history which was laid before the jury with surgical precision. proof that he "was involved in an abortive conspiracy to import heroin would scarcely have rendered his gloomy past worse. Nondisclosure of cumulative evidence tending only to further impeach a witness' general credibility is not grounds for granting a Rule 33 motion." *See also, Helmsley,* 985 F.2d at 1210. The Hunter. Malley and Cass affidavits are completely embraced by the foregoing. I would simply add, regarding those affidavits, that "[t]he government has no Brady obligation to 'communicate preliminary, challenged, or speculative information.'" *Amiel,* 95 F.3d at 145; *United States v. Diaz,* 922 F.2d 998, 1006 (2d Cir.1990), *cert. denied,* 500 U.S. 925, 111 S.Ct. 2035, 114 L.Ed.2d 119 (1991)(*quoting Agurs,* 427 U.S. at 109, n. 16, 96 S.Ct. at 2400, n. 16). Even a cursory reading of those hearsay-laden affidavits compels the conclusion that they are speculative in addition to being challenged.

If it were to be assumed that those affidavits are, indeed, relating evidence discovered after trial that could not have been discovered sooner with the exercise of reasonable diligence, that assumption may surely be questioned by reasonable persons, although that is not a basis upon which these motions are decided. The trial of John Gotti and Frank Locascio was a major news event, the daily progress of which was assiduously reported and prominently featured in the print, radio and television news media. The name of Salvatore Gravano. from the day his cooperation with the government became known,

was virtually always preceded by "rat." "turncoat," "informer," or a synonym thereof. For a period of time, posters appeared throughout the City depicting the body of a rat with the face of Gravano. In the cult of organized crime, the first and foremost principle which its members must obey, is the principle of omerta—silence—never to reveal the existence or workings of the mafia. Tr.2007. The words of John Gotti decreeing that the existence of a mafia is to be denied in briefs submitted on behalf of its members have been set out above. Death is assured for the person who is or is suspected of becoming a rat. In the lexicon of organized crime, there is no word that more pejoratively characterizes a person than "rat." Given the close association among the organized crime families in New York, it is probable, if not certain, that upon the announcement of Gravano's cooperation every derogatory fact or rumor about him cascaded into the defense camp from every boss, captain, soldier or associate of organized crime, or was readily available to the defendants for the asking. "[T]here comes a point where [the] court should not be ignorant as judges of what we know as men." *Watts v. Indiana,* 338 U.S. 49, 52, 69 S.Ct. 1347, 1349, 93 L.Ed. 1801 (1949). It is also surely fair to equate the affidavits submitted here with affidavits ostensibly prepared by co-defendants in aid of motions for a new trial which courts have always viewed with great caution. *See, e.g., United States v. Jacobs,* 475 F.2d 270, 286, n. 33 (2d Cir.) (Friendly, J.), *cert. denied,* 414 U.S. 821, 94 S.Ct. 116, 131, 38 L.Ed.2d 53 (1973).

The record set out above establishes beyond the slightest doubt that the defendants' assertion that the government impermissibly vouched for Gravano's testimony is disingenuous. Several observations in that connection are, nevertheless, appropriate. At the outset, the defendants attack upon the credibility of Gravano in their opening statements to the jury, permitted the government to introduce into evidence his cooperation agreement. *See, e.g., United States v. Musacchia,* 900 F.2d 493, 497 (2d Cir.1990), *cert. denied,* 501 U.S. 1250, 111 S.Ct. 2887, 115 L.Ed.2d 1052 (1991). That agreement, being in evidence. the government was free to in-

vite the jury to draw a particular inference from it and defense counsel was free to urge competing inferences which they did at great length at many stages of the trial. "By arguing as they did, both sides respected the jury's ability to evaluate credibility based on the facts in evidence. There was no vouching." *United States v. Renteria,* 106 F.3d 765 (7th Cir.1997) is precisely on point.

Particularly persuasive in this regard is Judge Learned Hand's view, expressed over seventy years ago in *DiCarlo v. United States,* 6 F.2d 364 (2d Cir.). *cert. denied,* 45 S.Ct. 640, 45 S.Ct. 640, 69 L.Ed. 1168 (1925), as follows, at p. 368:

> While, ... we recognize that the prosecution is by custom more rigidly limited than the defense, we must decline to assimilate its position to that of either judge or jury, or to confine a prosecuting attorney to an impartial statement of the evidence. He is an advocate, and it is entirely proper for him as earnestly as he can to persuade the jury of the truth of his side, of which he ought to be thoroughly convinced before he begins at all. *To shear him of all oratorical emphasis, while leaving wide latitude to the defense. is to load the scales of justice: it is to deny what has always been an accepted incident of jury trials. except in those jurisdictions where any serious execution of the criminal law has yielded to a ghostly phantom of the innocent man falsely convicted.* (Emphasis added).

A similar view, albeit in different terms, was expressed by Judge Hand ten years later in *United States v. Wexler,* 79 F.2d 526, 529–30 (2d Cir.1935), *cert. denied,* 297 U.S. 703, 56 S.Ct. 384, 80 L.Ed. 991 (1936), as follows:

> It is impossible to expect that a criminal trial shall be conducted without some show of feeling; the stakes are high, and the participants are inevitably charged with emotion. Courts make no such demand; they recognize that a jury inevitably catches this mood and that the truth is not likely to emerge, if the prosecution is confined to such detached exposition as would be appropriate in a lecture, while the defense is allowed those appeals in misericor-

diam which long custom has come to sanction. The question is always as to the particular incident challenged. in the setting of the whole trial.

In the setting of this whole trial, there was no vouching.

To the extent that Locascio dwells, and at some length, upon the insufficiency of the evidence to convict him, he has raised that contention before, has been rebuffed in *Locascio,* 6 F.3d at 944–45, and should not be permitted to raise it again.

A careful review of the record has exposed the poverty of the premises upon which these and the prior motions have been brought and the wisdom of the injunction to the district courts that they should exercise their authority to grant new trials only in the most extraordinary circumstances. *Locascio,* 6 F.3d at 949. Such circumstances are nonexistent here.

For all of the foregoing reasons the defendants' motion for a new trial and for an evidentiary hearing are denied. *United States v. Pavloyianis,* 996 F.2d 1467. 1475 (2d Cir.1993) (no rule of law requires a hearing in this sort of case where the relevant facts can be ascertained from the record.)

SO ORDERED.